PETITION FOR WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. § 2254

Prisoner's Name: Andrew Howard Brannan

Prisoner's Number: UNO-1041320

Place of Confinement: Georgia Diagnostic & Classification Prison
Jackson, Georgia 30233

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| ANDREW H. BRANNAN | ) | |
| Petitioner, | ) | |
| | ) | Civil Case No. _____ |
| v. | ) | |
| | ) | **THIS IS A CAPITAL CASE** |
| HILTON HALL, Warden, | ) | |
| Georgia Diagnostic & | ) | |
| Classification Prison, | ) | |
| Respondent. | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

H. Lane Dennard, Jr.
Ga. Bar No. 217750
851 Walker Cir.
Madison, GA 30650
(404) 352-5025

Brian S. Kammer
Ga. Bar No. 406322
Ga. Resource Center
303 Elizabeth St.
Atlanta, GA 30307
(404) 222-9202

COUNSEL FOR PETITIONER

# TABLE OF CONTENTS

NATURE OF RELIEF SOUGHT AND ALLEGATIONS OF ERROR ..................1

PROCEDURAL HISTORY.....................................................................4

PRELIMINARY STATEMENT OF THE CASE ...................................................6

GROUNDS FOR RELIEF .......................................................................8

CLAIM ONE
    PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE
    EFFECTIVE ASSISTANCE OF COUNSEL AT ALL STAGES OF
    HIS PRETRIAL, TRIAL, MOTION FOR NEW TRIAL, AND
    DIRECT APPEAL PROCEEDINGS IN VIOLATION OF THE
    FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS
    TO THE UNITED STATES CONSTITUTION, STRICKLAND V.
    WASHINGTON, 466 U.S. 668 (1984), AND RELATED
    PRECEDENT. ................................................................9

CLAIM TWO
    PETITIONER WAS DENIED HIS RIGHTS UNDER THE DUE
    PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND
    FOURTEENTH AMENDMENTS TO THE UNITED STATES
    CONSTITUTION WHEN THE PROSECUTION ENGAGED IN
    MISCONDUCT. .............................................................21

CLAIM THREE
    THE TRIAL COURT CONDUCTED PETITIONER'S TRIAL IN A
    MANNER THAT VIOLATED HIS RIGHTS UNDER THE DUE
    PROCESS CLAUSE AND THE FOURTH, FIFTH, SIXTH,
    EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
    STATES CONSTITUTION. .................................................30

i

CLAIM FOUR
 MISCONDUCT ON THE PART OF THE JURORS AT
 PETITIONER'S TRIAL VIOLATED HIS RIGHTS UNDER THE
 DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH,
 AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
 CONSTITUTION. ........................................................................35

CLAIM FIVE
 A DEATH SENTENCE IN THIS CASE IS DISPROPORTIONATE
 PUNISHMENT, AND SUCH ARBITRARY APPLICATION OF
 THE DEATH PENALTY VIOLATES THE EIGHTH AND
 FOURTEENTH AMENDMENTS TO THE UNITED STATES
 CONSTITUTION. ........................................................................41

CLAIM SIX
 THE DEATH PENALTY IN GEORGIA IS IMPOSED
 ARBITRARILY AND CAPRICIOUSLY AND AMOUNTS TO
 CRUEL AND UNUSUAL PUNISHMENT, VIOLATING
 PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE
 AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
 AMENDMENTS TO THE UNITED STATES CONSTITUTION. ............46

CLAIM SEVEN
 PETITIONER WAS DENIED ACCESS TO COMPETENT EXPERT
 ASSISTANCE IN VIOLATION OF AKE V. OKLAHOMA, 470 U.S.
 68 (1985), AND HIS RIGHTS UNDER THE FIFTH, SIXTH,
 EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
 STATES CONSTITUTION. ............................................................48

CLAIM EIGHT
 PETITIONER WAS DENIED DUE PROCESS OF LAW WHEN
 THE SAME JURY THAT CONVICTED HIM WAS RESPONSIBLE
 FOR DETERMINING THE APPROPRIATE SENTENCE IN
 VIOLATION OF HIS RIGHTS UNDER THE DUE PROCESS
 CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND
 FOURTEENTH AMENDMENTS OF THE UNITED STATES
 CONSTITUTION. ........................................................................52

ii

CLAIM NINE
     PETITIONER WAS DENIED DUE PROCESS OF LAW BY THE
     INSTRUCTIONS GIVEN TO THE JURY AT THE
     GUILT/INNOCENCE PHASE OF THE TRIAL IN VIOLATION OF
     HIS RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE
     FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS
     TO THE UNITED STATES CONSTITUTION. .......................................... 57

CLAIM TEN
     PETITIONER WAS DENIED DUE PROCESS OF LAW BY THE
     INSTRUCTIONS THAT WERE GIVEN TO THE JURY AT THE
     AGGRAVATION/MITIGATION PHASE OF TRIAL IN
     VIOLATION OF HIS RIGHTS UNDER THE DUE PROCESS
     CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND
     FOURTEENTH AMENDMENTS TO THE UNITED STATES
     CONSTITUTION. ......................................................................................59

A.    Mitigating Circumstances...............................................................................59

B.    Aggravating Circumstances.........................................................................66

C.    Unanimity ...................................................................................................68

CLAIM ELEVEN
     THE TRIAL COURT ERRONEOUSLY DENIED PETITIONER'S
     CHALLENGE TO THE JURY ARRAYS IN VIOLATION OF HIS
     RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE
     FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS
     TO THE UNITED STATES CONSTITUTION. .........................................70

CLAIM TWELVE
     THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY
     IMPROPERLY EXCUSING MULTIPLE PROSPECTIVE JURORS
     FOR CAUSE IN VIOLATION OF PETITIONER'S RIGHTS
     UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH,
     EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
     STATES CONSTITUTION. .......................................................................73

CLAIM THIRTEEN
>THE TRIAL COURT ERRONEOUSLY RESTRICTED THE DEFENSE'S VOID DIRE OF PROSPECTIVE JURORS IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. .......................................................................75

CLAIM FOURTEEN
>THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ALLOWING PROSECUTION WITNESS, DON MATECUN, TO TESTIFY, THEREBY VIOLATING PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ....................................................... 79

CLAIM FIFTEEN
>THE TRIAL COURT ERRONEOUSLY ADMITTED GRUESOME AND REDUNDANT CRIME SCENE PHOTOGRAPHS INTO EVIDENCE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. .......................................................81

CLAIM SIXTEEN
>THE TRIAL COURT ERRONEOUSLY PERMITTED THE STATE TO DISPLAY, AND THEN ADMITTED INTO EVIDENCE, THE CLOTHING OF THE VICTIM AND THEN EXACERBATED THE ERROR BY DENYING THE DEFENSE'S MOTION FOR MISTRIAL AFTER AN EMOTIONAL OUTBURST BY THE VICTIM'S MOTHER IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. .......................................................84

iv

CLAIM SEVENTEEN
     THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY
     COMMENTING, BEFORE THE JURY, ON THE LIMITED
     VIEWING OF THE VIDEOTAPE IN VIOLATION OF
     PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE
     AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
     AMENDMENTS TO THE UNITED STATES CONSTITUTION...............85

CLAIM EIGHTEEN
     THE TRIAL COURT ERRONEOUSLY PERMITTED THE STATE
     TO PLAY THE VIDEOTAPE DURING ITS CLOSING
     ARGUMENT OF THE GUILT/INNOCENCE PHASE OF THE
     TRIAL IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE
     DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH,
     AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
     CONSTITUTION. .........................................................................87

CLAIM NINETEEN
     THE TRIAL COURT ERRONEOUSLY ALLOWED THE STATE
     TO PROVIDE PETITIONER WITH INADEQUATE, UNTIMELY
     NOTICE OF CERTAIN AGGRAVATING CIRCUMSTANCE AND
     THEN REFUSED TO REMEDY THE INADEQUATE NOTICE IN
     VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE
     PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND
     FOURTEENTH AMENDMENTS TO THE UNITED STATES
     CONSTITUTION. .........................................................................88

CLAIM TWENTY
     THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY
     ALLOWING THE STATE TO PRESENT IMPROPER VICTIM
     IMPACT EVIDENCE IN VIOLATION OF PETITIONER'S RIGHTS
     UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH,
     EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
     STATES CONSTITUTION. ...........................................................90

CLAIM TWENTY-ONE
    THE TRIAL COURT ERRONEOUSLY PERMITTED THE STATE
    TO PROCEED WITH ALL OF THE POSSIBLE AGGRAVATING
    CIRCUMSTANCES NOTWITHSTANDING THE INSUFFICIENT
    EVIDENCE TO SUPPORT SUCH AGGRAVATORS IN
    VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE
    PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND
    FOURTEENTH AMENDMENTS TO THE UNITED STATES
    CONSTITUTION. ......................................................................................92

CLAIM TWENTY-TWO
    THE TRIAL COURT ERRONEOUSLY ALLOWED THE STATE
    TO PRESENT INFLAMMATORY TESTIMONY BY RICKY
    HORNE DESPITE THE IMPROPER NOTICE OF THE
    TESTIMONY IN VIOLATION OF PETITIONER'S RIGHTS
    UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH,
    EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
    STATES CONSTITUTION. ........................................................................94

CLAIM TWENTY-THREE
    SECTION 16-5-1, O.C.G.A., FAILS TO ADEQUATELY DEFINE
    MURDER, AND THUS PETITIONER'S TRIAL FOR THE
    OFFENSE OCCURRED IN VIOLATION OF PETITIONER'S
    RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE
    FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS
    TO THE UNITED STATES CONSTITUTION. .........................................96

CLAIM TWENTY-FOUR
    THE PROCESS OF DEATH-QUALIFYING JURORS, WHICH
    WAS EMPLOYED AT PETITIONER'S TRIAL, IS
    UNCONSTITUTIONAL AND VIOLATED PETITIONER'S
    RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE
    FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS
    TO THE UNITED STATES CONSTITUTION. .........................................98

CLAIM TWENTY-FIVE
THE TRIAL COURT IMPROPERLY DENIED PETITIONER'S
PRE-TRIAL MOTIONS IN VIOLATION OF PETITIONER'S
RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE
FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION............101

A.      Motion to Exclude the Death Penalty on Account of the Arbitrary Use
        of Prosecutorial Discretion in the Plea Bargaining Process........................101

B.      Motion to Dismiss on the Merits Because of Prosecutorial Misconduct
        or in the Alternative Motion in Limine and Motion to Exclude Certain
        Evidence...........................................................................................105

CLAIM TWENTY-SIX
THE TRIAL COURT ERRONEOUSLY ADMITTED THE
TESTIMONY OF THE COURT-APPOINTED PSYCHIATRIST
DESPITE THAT HIS ACTIONS AND PROFESSED
UNDERSTANDING OF HIS ROLE DEMONSTRATED A CLEAR
PARTIALITY TOWARDS THE STATE IN VIOLATION OF
PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE
AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION. ..........108

CLAIM TWENTY-SEVEN
THE TRIAL COURT ERRONEOUSLY DENIED PETITIONER'S
BATSON CHALLENGES AND PERMITTED THE STATE TO
STRIKE POTENTIAL JURORS BASED ON RACE IN
VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE
PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION. .....................................................................................113

A.      Prospective Juror Gasque .........................................................114

B.      Prospective Juror Jackson.........................................................116

C.      Prospective Juror Johnson .......................................................118

D.     Prospective Juror Lampkin ........................................................119

E.     Prospective Juror Moore ........................................................120

F.     Prospective Juror Murray .......................................................123

G.     Prospective Juror Williams .....................................................123

CLAIM TWENTY-EIGHT
     THE TRIAL COURT'S REHABILITATION OF PROSPECTIVE
     JURORS AND ITS FAILURE TO EXCLUDE CERTAIN
     PROSPECTIVE JURORS FOR CAUSE VIOLATED
     PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE
     AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
     AMENDMENTS TO THE UNITED STATES CONSTITUTION............126

CLAIM TWENTY-NINE
     PETITIONER'S TRIAL WAS FRAUGHT WITH PROCEDURAL
     AND SUBSTANTIVE ERRORS, WHICH CANNOT BE
     HARMLESS WHEN VIEWED AS A WHOLE, AS THEY
     DEPRIVED HIM OF THE FUNDAMENTALLY FAIR TRIAL TO
     WHICH HE IS CONSTITUTIONALLY GUARANTEED UNDER
     THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH,
     EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
     STATES CONSTITUTION. ...................................................129

CLAIM THIRTY
     AS PETITIONER HAS LONGSTANDING, SEVERE MENTAL
     ILLNESS, HIS EXECUTION WILL VIOLATE THE PROHIBITION
     AGAINST CRUEL AND UNUSUAL PUNISHMENT IN THE
     EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED
     STATES CONSTITUTION. ...................................................134

A.     Evolving standards of decency prohibit the execution of individuals
     with severe mental illness, such as Petitioner. ...........................136

B.  As a severely mentally ill person, Petitioner's death sentence is grossly disproportionate to his personal culpability. .................................................138

C.  Petitioner's death sentence lacks penological justification.........................140

CLAIM THIRTY-ONE
THE EXECUTION OF PETITIONER BY LETHAL INJECTION AS CARRIED OUT BY THE STATE OF GEORGIA AND THE GEORGIA DEPARTMENT OF CORRECTIONS WOULD CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT AND A MISCARRIAGE OF JUSTICE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ....................................................................143

PRAYER FOR RELIEF .......................................................................146

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| ANDREW H. BRANNAN | ) | |
| Petitioner, | ) | |
| | ) | Civil Case No. _____ |
| v. | ) | |
| | ) | **CAPITAL CASE** |
| HILTON HALL, Warden, | ) | |
| Georgia Diagnostic & | ) | |
| Classification Prison, | ) | |
| Respondent. | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

Comes the Petitioner, ANDREW H. BRANNAN, by and through

undersigned counsel, and invokes this Court's jurisdiction pursuant to 28 U.S.C. §

ix

1331 and 28 U.S.C. § 2254. Petitioner is an indigent person currently under a sentence of death and incarcerated in Jackson, Georgia at the Georgia Diagnostic & Classification Prison. This is the first time Petitioner has sought a writ of habeas corpus in federal court.

## NATURE OF RELIEF SOUGHT AND ALLEGATIONS OF ERROR

1.) This petition follows the form established by the Model Form for Use in Applications for Habeas Corpus under 28 U.S.C. § 2254, prescribed by the Rules Governing § 2254 Cases in United States District Courts. It pleads Petitioner's claims for relief and alleges the constitutional errors raised. In conformity with the form and practice, the petition does not make detailed legal argument, address procedural issues or affirmative defenses that Respondent may choose to raise, or analyze in any detail the state court decisions under the provisions of 28 U.S.C. § 2254(d) and (e). Petitioner shall respond in memoranda of law to any procedural issues the Respondent may raise as affirmative defenses and shall submit briefing on the merits of the claims properly before the court which will include analysis under § 2254(d) and (e).

2.) This petition states claims that have been raised in state courts in exhaustion of state remedies. It is being filed on this date in order to comply with the limitations period of the Anti-Terrorism and Effective Death Penalty Act.

2

However, the investigation and research of Petitioner's case continues, and he may seek permission of the Court to amend, correct, or modify the claims based upon the result of this continued investigation and research.

3.)     Petitioner is indigent and was so found by the Georgia state courts during state post-conviction proceedings. Petitioner requests leave to proceed <u>in forma pauperis</u> in this proceeding via motion filed herewith.

4.)     Petitioner seeks relief in the form of an order granting the writ of habeas corpus as to his conviction and death sentence, and granting all other relief which the Court may deem just, proper, and equitable. Petitioner seeks this Court's protection and intercession because the Georgia state courts have violated and/or unreasonably and arbitrarily refused to correct violations of the Petitioner's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, resulting in Petitioner's unconstitutional conviction of murder and sentence of death. Petitioner contends that the state courts' findings are contrary to and/or an unreasonable application of clearly established federal law as determined by the United States Supreme Court; involved an unreasonable determination of the facts in light of the evidence; and/or involved the unreasonable and arbitrary denial of relief. *See* 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).

5.)     Petitioner requests that this Court afford him all the protections

3

promised by federal habeas corpus statutes, the Rules Governing § 2254 Cases in the United States District Courts, the Criminal Justice Act, the Anti-Drug Abuse Act of 1988, and all other pertinent statutes, court rules, and case law. Finally, Petitioner seeks an order granting this petition for writ of habeas corpus.[1]

## **PROCEDURAL HISTORY**

6.)   Petitioner is a person in state custody of the State of Georgia under the terms of the verdicts entered on January 28, 2000, and January 30, 2000, in the Superior Court of Laurens County, Georgia. Pursuant to these judgments, Petitioner was convicted of one count of malice murder and sentenced to death. Petitioner is incarcerated at the Georgia Diagnostic & Classification Prison in Jackson (Butts County), Georgia.

7.)   The Supreme Court of Georgia affirmed Petitioner's convictions and sentences of death on March 25, 2002. Brannan v. State, 561 S.E. 2d 414 (Ga. 2002). A timely-filed motion for reconsideration was denied on April 10, 2002.

8.)   On September 5, 2002, Petitioner filed a Petition for Writ of Certiorari

---

[1]   Petitioner requests that this Court order that all of the filings, testimony, evidence and pleadings in the state habeas proceedings, the direct appeal proceedings, and the trial proceedings be made part of this record. Further, Petitioner herein specifically adopts, and incorporates herein, all claims for relief, enumerations of error, and supporting arguments and authority that were presented in the state courts. Petitioner does not waive nor abandon any of the claims for relief presented on direct appeal and during state post-conviction proceedings.

in the United States Supreme Court. Certiorari review was denied on November 12, 2002. Brannan v. Georgia, 123 S. Ct. 541 (2002). Rehearing was denied on January 13, 2003.

9.)     On April 22, 2003, an Order of Execution was entered by the Laurens County Superior Court setting Petitioner's execution to occur sometime between noon on May 5, 2003, and noon on May 12, 2003. On May 2, 2003, Petitioner filed a Petition for a Writ of Habeas Corpus in the Superior Court of Butts County, Georgia, pursuant to O.C.G.A. § 9-14-141 et. seq. A stay of execution was promptly entered.

10.)     Petitioner was granted indigent status for the purposes of pursuing state habeas corpus remedies. In August 2005, he amended his state habeas petition. After an evidentiary hearing and submission of post-hearing briefs, the state habeas court granted the writ and vacated Petitioner's conviction and death sentence.

11.)     On appeal, the Georgia Supreme Court reversed the habeas court's grant of relief and reinstated Petitioner's conviction and death sentence. Hall v. Brannan, 670 S.E. 2d 87 (Ga., Nov. 3, 2008). A timely motion for reconsideration was denied on December 15, 2008.

12.)     Petitioner now files this initial federal habeas petition in the United

States District Court for the Southern District of Georgia.

13.)   Petitioner has no other petitions, applications, or motions pending with respect to his conviction and death sentence.   Petitioner's conviction and death sentence violate his rights under the Due Process Clause and the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[2]

## PRELIMINARY STATEMENT OF THE CASE

14.)   Petitioner Andrew Brannan, a Vietnam Veteran, has a longstanding and well-documented history of two chronic and severe mental illnesses:  Bipolar Disorder and Post-Traumatic Stress Disorder (hereinafter PTSD).  Petitioner began exhibiting symptoms of depression as an adolescent, and his crippling PTSD

---

[2]   Throughout this brief, Petitioner will abbreviate citations in accordance with the examples below.  All other citations will be based on the standard legal citations or will be self-explanatory.

- Pretrial Proceedings – (PT. date of hearing at page number).
- Voir Dire Transcript – (V. at page number).
- Trial Transcript – (T. at page number).
- Record on Appeal – (R. at page number).
- Transcript of 2006 Habeas Corpus Evidentiary Hearing – (EH. T. at volume number: page number).
- Petitioner's Exhibits – (PX. exhibit number at volume number: page number).
- Respondent's Exhibits – (RX. exhibit number at volume number: page number).

manifested soon after his return from the Vietnam War, where he served honorably

as a First Lieutenant and saw extensive combat, losing many of his comrades and

soldiers for whom he was responsible as well losing two commanding officers

during the war.  Even more trauma came after his return to the United States when

Petitioner lost his older brother to a military plane crash and his only other sibling,

a younger brother, to suicide.  These traumas greatly exacerbated his already

existing mental illness, and, as a result, Petitioner began a long road of

psychological counseling and psychiatric treatment.

15.)   Every mental health professional who has evaluated Petitioner in the

last twenty years has concluded that he suffers from chronic, severe PTSD as a

result of these multiple traumas.  These mental health professionals also have

concluded that Petitioner suffers from intense depression, mood swings, and

episodes of mania, and he has been consistently treated for and diagnosed with

Bipolar Disorder.

16.)   In order to assess Petitioner's culpability, his jury needed to

understand his full mental health history – the significant impairment both Bipolar

Disorder and PTSD had on Petitioner as well as the exacerbating effect the

disorders had on each other.  Petitioner's trial counsel, however, failed to

understand themselves and thus failed to convey to the jury the remarkable

7

mitigating circumstances of Petitioner's life and military service and, more importantly, the full picture of Petitioner's two mental illnesses.

17.)    In addition, counsel were ineffective due to their unreasonable failure to present uncontroverted evidence that Petitioner met the statutory criteria for a guilty but mentally ill verdict as well as their unreasonable failure to adequately investigate, understand, and present the compelling evidence of Petitioner's military service, his Bipolar Disorder, and the fact that he was not properly medicated at the time of the offense.

18.)    Deprived of this compelling evidence, Petitioner's jury could not begin to understand his mental state at the time of the offense, how it directly affected his actions and thinking during the traffic stop with Deputy Kyle Dinkheller, and could not accurately assess Petitioner's personal culpability for Deputy Dinkheller's death.  As a result, this Court cannot have confidence in the reliability of Petitioner's conviction or death sentence.

## **GROUNDS FOR RELIEF**

14.)    All grounds for relief in this petition are based on violations of the Due Process Clause and the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

15.)    All grounds for relief in this petition are based on violations of the

8

Due Process Clause and the Fourth, Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution.

## CLAIM ONE

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT ALL STAGES OF HIS PRETRIAL, TRIAL, MOTION FOR NEW TRIAL, AND DIRECT APPEAL PROCEEDINGS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, STRICKLAND V. WASHINGTON, 466 U.S. 668 (1984), AND RELATED PRECEDENT.**

16.)    This Claim is evidenced by the following:

17.)    All other claims and allegations in this Petition are incorporated herein by specific reference.

18.)    A criminal defendant is entitled to the effective assistance of counsel under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.  Gideon v. Wainwright, 372 U.S. 335 (1963); see also Article I, Section I of the Georgia Constitution.  As the U.S. Supreme Court has made abundantly clear, the right to counsel is not satisfied by the mere appointment of an attorney to represent a defendant.  Instead, a defendant's constitutional rights are only satisfied when he is represented by counsel and when that counsel provides effective representation.  Strickland v. Washington, 466 U.S. 668 (1984).  "[I]f counsel's conduct at trial, viewed in the context of the totality of circumstances, falls below the range of competency generally demanded of attorneys in criminal cases, a criminal conviction obtained through such a trial unconstitutionally

10

deprives the defendant of his liberty." <u>Young v. Zant</u>, 677 F.2d 792, 798 (11th Cir. 1982).

19.)    Petitioner was denied his right to effective assistance of counsel at his capital trial in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the mandates of the Supreme Court of the United States in <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), <u>Williams v. Taylor</u>, 120 S. Ct. 1495 (2000), <u>Rompilla v. Beard</u>, 125 S. Ct. 2456 (2005), and <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Trial counsel's ineffectiveness includes, but is not limited to, the following:

- Trial counsel unreasonably agreed to expose the jury to inflammatory, unfair evidence (specifically an irrelevant and unduly prejudicial portion of the video of the traffic stop) and for requesting that the jury be deprived of evidence of Petitioner's remorse.[3]

- Trial counsel unreasonably stipulated to the admission of irrelevant and unduly prejudicial videotape evidence.

- Trial counsel unreasonably prevented the jury from hearing evidence of Petitioner's remorse.

---

[3]    Herein, the videotape refers to a tape recording of the traffic stop between Deputy Dinkheller and Petitioner.  When Deputy Dinkheller began to pull over Petitioner for speeding and activated the blue lights on his patrol car, a video camera aimed through the patrol car windshield was automatically activated. (PX. 69 at 20:5253; PX. 168 at 32:9230).  The video camera recorded the entire traffic stop, also recording a time stamp onto the videotape.  (PX. 50 at 18; PX. 151 at 27:7579-80; EH. T. at 3:467-69).  Deputy Dinkheller also wore a microphone, which recorded audio onto the same videotape.  (EH. T. at 3:459).

11

- Trial counsel failed to utilize the court-appointed psychiatrist, Dr. Carter, who found Petitioner to have longstanding, severe mental illness that was present at the time of the offense. Trial counsel erroneously told the jury that Dr. Carter did not believe Petitioner to be mentally ill and that Dr. Carter's opinions should be discounted.

- Trial counsel never elicited critical, available testimony from Dr. Carter regarding Petitioner's longstanding, severe mental illness.

- Trial counsel failed to adequately investigate, prepare, and present evidence of Petitioner's PTSD and Bipolar Disorder and for depriving the jury of evidence of the details, origin, and development of these severe psychiatric disorders.

- Trial counsel unreasonably failed to uncover and present details about Petitioner's military service and the traumas he saw in Vietnam.

- Trial counsel unreasonably failed to learn that Petitioner qualified for a verdict of guilty but mentally ill at the time of the offense.

- Trial counsel unreasonably failed to present testimony that Petitioner's inappropriate, odd laughter was a manifestation of his mental illness.

- Trial counsel unreasonably failed to present evidence of the individual characteristics that predisposed Petitioner to suffering from PTSD.

- Trial counsel failed to adequately investigate, prepare, and present evidence of Petitioner's mental state at the time of the offense and for depriving the jury of evidence that Petitioner was not properly medicated and was suicidal during the offense.

- Trial counsel failed to adequately investigate, prepare, and present expert testimony about the events of the traffic stop and for depriving the jury of evidence that Petitioner did not fire first and evidence that mitigates Petitioner's culpability.

12

- Trial counsel failed to deliver on their promise to the jury that it would hear testimony from the psychiatrist who was treating Petitioner at the time of the offense.

- Trial counsel were ineffective for failing to rebut the prosecution's argument that Petitioner was malingering in order to receive disability benefits with available evidence that Petitioner was reluctant to seek benefits and did so only with the urging of the VA staff.

- Trial counsel failed to present available evidence regarding the strict process the VA employs to evaluate disability claims.

- Trial counsel unreasonably based the entire defense on insanity when minimal evidence supported such a verdict.

- Trial counsel failed to adequately investigate, prepare, and present mitigating evidence during the penalty phase of the trial, depriving the jury of evidence to support saving Petitioner's life.

- Trial counsel failed to conduct an adequate pretrial investigation into both the State's case and defenses available to Petitioner, including but not limited to the psychological, medical and psychiatric factors affecting Petitioner's mental state during, before, and after the offense;

- Trial counsel failed to make adequate and timely requests for continuances in order to prepare for trial and failed to make use of time available to adequately investigate and prepare for trial;

- Trial counsel failed to make timely requests for the assistance of investigative support, particularly the assistance of a crime scene expert and an expert on future dangerousness, so that counsel could have conducted a thorough and adequate pretrial investigation into available defenses at both phases of trial;

- Trial counsel failed to conduct an adequate pretrial investigation into Petitioner's life and background to uncover and present to the jury

13

evidence in mitigation of punishment, including evidence of his family and home background as well as his military service;

- Trial counsel failed to locate, interview, and present as witnesses numerous individuals who had compelling mitigating evidence regarding Petitioner;

- Trial counsel failed to timely file several pretrial motions necessary to protect Petitioner's right to a fair trial;

- Trial counsel failed to adequately object and litigate that the prosecution should be precluded from introducing evidence of other bad acts and misconduct;

- Trial counsel failed to conduct an adequate pretrial investigation into the voluntariness of Petitioner's statements to law enforcement personnel, and specifically failed to investigate the effect of Petitioner's mental capacity, and his medical and psychological history on Petitioner's mental state at the time he provided the incriminating statements;

- Trial counsel failed to adequately present information and evidence in pretrial motions and proceedings and at trial relating to Petitioner's allegedly voluntary waiver of constitutional rights during interrogation by the police;

- Trial counsel failed to obtain those records, including educational, medical, and mental health records of Petitioner and his family which would have assisted in formulating and supporting defenses in the guilt/innocence phase of the case;

- Trial counsel failed to obtain all records and files in the possession of the State to which Petitioner was entitled;

- Trial counsel failed to utilize expert witnesses to determine the events of the firefight and to determine whether Petitioner shot first;

14

- Trial counsel failed to review all records, files, and evidence in the possession of the State to which Petitioner was entitled access;

- Trial counsel failed during voir dire to adequately prepare for and examine potential jurors with regard to their understanding of the presumption of innocence, potential bias regarding the death penalty, and other issues; to adequately challenge the trial court's improper excusal of certain jurors for hardship reasons; to adequately challenge the trial court's improper voir dire of potential jurors; to adequately challenge the trial court's refusal to excuse certain jurors for cause; to adequately challenge the district attorney's improper voir dire; and to adequately protect Petitioner's right to a jury pool and jury which adequately represented the community;

- Trial counsel failed to make an informed and knowledgeable decision to waive the confidentiality of the opinions and findings of Petitioner's mental health expert;

- Trial counsel failed to support their chosen defense by securing the services of necessary experts, including but not limited to crime scene experts, and other experts with which counsel could have effectively challenged the State's case against Petitioner at either phases of trial;

- Trial counsel failed to object to the admission of several items of evidence and testimony offered by the State during the guilt/innocence and sentencing phases of trial and permitted the jury to receive and consider evidence that was improper, inadmissible, prejudicial, irrelevant, and/or false;

- Trial counsel failed to have experts explain the role of Petitioner's mental illness in his statements to law enforcement;
- Trial counsel failed to raise proper and timely objections to improper charges given by the trial court to the jury at the conclusion of the guilt and penalty trials;

- Trial counsel failed to prepare and adequately examine the mental health witnesses called by the court during guilt phase and called by Petitioner during penalty phase;

15

- Trial counsel failed to provide conflict-free representation to Petitioner;

- Trial counsel failed to prepare and adequately examine the defense witnesses called during the aggravation/mitigation trial;

- Trial counsel failed to adequately present evidence and to raise defenses at the guilt/innocence phase of the case, including but not limited to evidence and defenses based upon Petitioner's mental state at the time of the alleged offenses;

- Trial counsel failed to present material evidence that was reasonably available to counsel during Petitioner's guilt/innocence and aggravation/mitigation trials;

- Trial counsel failed to adequately cross-examine the State's witnesses, including but not limited to the failure to impeach, the failure to explore questions of bias and motive on the part of the witnesses, the failure to correct or prevent false testimony, and, in several instances, the failure to conduct any cross-examination;

- Trial counsel failed to present its case and arguments to the jury in a logical, effective manner;

- Trial counsel failed to understand the role of mitigation, the need for mitigation, what constitutes mitigation, and how to effectively present a case for mitigation at the penalty phase;

- Trial counsel failed to challenge the traverse jury in a timely and adequate manner;

- Trial counsel failed to adequately challenge the prosecution's late and prejudicial notice of aggravation and aggravation witnesses;

- Trial counsel failed to adequately object to the actions and emotional displays of members of the public who observed the trial, even when such displays were obvious to the jury and prejudicial to Petitioner;

16

- Trial counsel failed to object to the prosecution's impermissible, disparaging comments about Petitioner's defense;

- Trial counsel failed to adequately object and litigate the trial court charging the jury with inappropriate and inapplicable instructions in the guilt/innocence trial;

- Trial counsel failed to request and litigate appropriate and applicable jury instructions at the guilt/innocence and sentencing trials;

- Trial counsel erroneously requested improper jury instructions, including those regarding a guilty but mentally ill verdict;

- Trial counsel failed to object to those portions of the trial court's charge which failed to adequately define mitigating circumstances and misled the jury in other ways;

- Trial counsel failed to present significant evidence that Petitioner suffered from a major mental illness prior to, during, and subsequent to the offense;

- Trial counsel failed to make informed and competent opening statements and closing arguments in the guilt/innocence and aggravation/mitigation trials;

- Trial counsel failed to adequately prepare Petitioner's witnesses, failed to elicit relevant, mitigating evidence that the witnesses possessed, failed limit the scope of their testimony to relevant, mitigating evidence;

- Trial counsel failed to adequately object to and litigate the improper admission of certain evidence, including but not limited to the videotape of the offense, photographs, and the victim's clothing;

- Trial counsel failed to represent Petitioner with full loyalty and to represent Petitioner in his best interests;

17

- Trial counsel failed to read documents that counsel entered into evidence;

- Trial counsel failed to question mental health experts about Petitioner's eligibility for a guilty but mentally ill verdict;

- Trial counsel failed to explain to the jury the contents and significance of exhibits entered into evidence;

- Trial counsel failed to subpoena documents and witnesses in a timely and adequate manner;

- Trial counsel failed to adequately challenge the prosecution for striking prospective jurors on the basis of race and/or gender;

- Trial counsel failed to elicit favorable, mitigating testimony from the State's witnesses and the court-appointed mental health expert;

- Trial counsel failed to adequately protect Petitioner's constitutional rights during all stages of Petitioner's trial, including but not limited to Petitioner's rights under the Confrontation Clause;

- Trial counsel failed to adequately object to and litigate improper testimony, including but not limited to testimony that was hearsay, irrelevant, cumulative, outside the personal knowledge of the witness, and testimony that was highly prejudicial;

- Trial counsel failed to object to improper and prejudicial statements made by the State during opening and closing arguments of both the guilt/innocence and sentencing phases of the trial;

- Trial counsel failed to request and obtain that the court inquire into possible juror misconduct by questioning jurors or by permitting counsel to question jurors;

- Trial counsel failed to object to defects in the charging documents;

- Trial counsel failed to ensure that sensitive bench conferences were kept outside of the hearing of the jury;

- Trial counsel failed to emphasize to the jury that it could consider that evidence presented during the guilt/innocence phase as mitigation evidence during the penalty phase;

- Trial counsel unreasonably failed to assure Petitioner's presence during critical stages of the trial;

- Trial counsel failed to call as witnesses mental health and medical professionals who had evaluated and treated Petitioner;

- Trial counsel improperly stipulated to the admission of highly prejudicial and irrelevant evidence, including portions of the videotape of the offense;

- Trial counsel failed to adequately and timely respond to requests by mental health witnesses for background records necessary for complete and accurate evaluations of Petitioner;

- Trial counsel failed to corroborate facts and statements of Petitioner that mental health experts relied upon in their evaluations and diagnoses;

- Trial counsel failed to adequately and timely respond to specific orders by the trial court regarding evaluations of Petitioner's mental health;

- Trial counsel failed to ensure that all evidence in this case be preserved for use during Petitioner's habeas corpus proceedings;

- Trial counsel failed to object to the trial court compelling prejudicial and incriminating testimony during the guilt/innocence trial;

- Trial counsel failed to object to improper and extraneous comments by the judge;

19

- Trial counsel failed to object to burden-shifting;

- Trial counsel failed to adequately and timely object to improper statements the prosecution made during closing arguments;

- Trial counsel failed to ensure that the jury verdicts were on a proper, non-leading, and non-prejudicial verdict form;

- Trial counsel failed to explain Petitioner's mental illness in a thorough, clear, and complete manner;

- Trial counsel failed to investigate and present evidence to rebut the aggravating evidence presented by the prosecution;

- Trial counsel failed to present mental health testimony during the penalty phase as mitigating evidence;

- Trial counsel failed to object to the prosecution's comparison of Petitioner to Lucifer;

- Petitioner's counsel failed to present these issues during the Motion for New Trial and on appeal to the Georgia Supreme Court.

20.)    But for counsel's ineffective representation, there is a reasonable probability that the result of each phase of trial would have been different.

21.)    The appellate level right to effective assistance of counsel incorporates the Sixth Amendment right to effective assistance of counsel.  Evitts v. Lucey, 105 S. Ct. 830 (1985).  Appellate counsel must function as "an active advocate on behalf of his client," Anders v. California, 386 U.S. 738 (1967), who must receive "expert professional . . . assistance  . . . [which is] necessary in a legal system governed by complex rules and procedure. . . ."  Lucey, 105 S. Ct. 830, 835

20

n.6.

22.)     Counsel must "affirmatively promote his client's position before the
court . . . to induce the court to pursue all the more vigorously its own review but
also to the legal authorities as furnished it by counsel." Anders, 386 U.S. at 745;
see also Matire v. Wainwright, 811 F.2d 1430 (11th Cir. 1987); Mylar v. Alabama,
671 F.2d 1299 (11th Cir. 1982).

23.)     Counsel rendered ineffective assistance on direct appeal when they
unreasonably and prejudicially failed to raise meritorious issues on appeal, and by
extraordinary motion for new trial.  It is undisputed that motion for new trial and
direct appeal are critical stages at which constitutionally effective counsel is
required.  See Pennsylvania v. Finney, 481 U.S. 551 (1990); Douglas v. California,
372 U.S. 353 (1963); Hooks v. Wainwright, 775 F.2d 1433, 1437 (11th Cir. 1985);
Dankert v. Wharton, 733 F.2d 1537 (11th Cir. 1984); Williams v. Turpin, 86 F.3d
1204 (11th Cir. 1996).

24.)    The ineffective assistance provided by Petitioner's trial and appellate
counsel violated his rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution.  As the failure of the state court to
grant relief on this claim is contrary to or an unreasonable application of Supreme
Court authority or is based upon an unreasonable determination of the underlying

21

facts in light of the evidence presented, habeas relief should follow.

## CLAIM TWO

**PETITIONER WAS DENIED HIS RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE PROSECUTION ENGAGED IN MISCONDUCT.**

25.)    This Claim is evidenced by the following:

26.)    All other claims and allegations in this Petition are incorporated

herein by specific reference.

27.)     During the guilt/innocence phase of Petitioner's trial as well as the

mitigation/aggravation phase, the State delivered a series of improper, inflammatory,

and unsubstantiated arguments, which violated Petitioner's rights to due process and

a fair trial.[4]

28.)     "[D]eliberate deception of a court and jurors . . . is incompatible with

rudimentary demands of justice." Giglio v. United States, 405 U.S. 150, 153 (1972)

(internal quotations, citations omitted).  Whether false arguments are "a result of

---

[4]      To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.  However, this claim survives despite the continuing failure of defense counsel to object to the State's egregious arguments.  See Mullins v. State, 270 Ga. 450, 511 S.E. 2d 165 (1999) (explaining that, in capital cases, error as to improper prosecutorial argument is not waived for failure to contemporaneously object); Parks v. State,

22

negligence or design, [they are] the responsibility of the prosecutor." Id. at 154. "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty" to ensure that the jury knows the truth. Napue v. Illinois, 360 U.S. 264, 269 (1959). So long as there is a reasonable likelihood that false argument influenced the jury's judgment, justice demands a new trial. Id. at 272.

29.) In Petitioner's case, the prosecution made multiple arguments that were inflammatory and unsubstantiated, including but not limited to arguing that Petitioner malingered his psychiatric symptoms and exaggerated his mental illness to deceive the government and fraudulently obtain disability benefits. Such arguments contravened the State's duties and cannot be tolerated by the Court.

> A prosecutor's role is to seek truth, not merely to secure
> convictions. His role is not just an adversarial one;
> rather, he is the representative not of an ordinary party to
> a controversy, but of a sovereignty . . . whose interest . . .
> in a criminal prosecution is not that it shall win a case,
> but that justice shall be done.

Berger v. United States, 295 U.S. 78, 88 (1935). Dishonest conduct must not be judicially approbated. Banks v. Dretke, 540 U.S. 668, 697 (2004).

30.) In addition, the State improperly suggested that sentencing Petitioner

---

254 Ga. 403, 330 S.E. 2d 686 (1985) (explaining that reversal may be required due to improper State arguments despite the absence of defense objections).

to death would serve as a deterrent to others. The State implored the jury to return a

death sentence as a means of preventing similar future crimes, commanding the jury

to ensure "that this will never happen again." (T. at 1395-1396). The State's

argument that deterrence was a basis to sentence Petitioner to death was entirely

improper.[5] The State encouraged the jury to sentence Petitioner to death to punish

him for killing the deputy but also to protect other officers from subsequent similar

crimes. This argument "resulted in a fundamentally unfair sentencing proceeding."

Id. at 1480. It is analogous to the prosecution's argument in Wallace v. Kemp, 581

F. Supp 1471 (M.D. Ga. 1984), which was held to be contrived and inappropriate,

warranting a reversal of the death sentence. "The only relevant issue in a capital

sentencing proceeding is the particular circumstances of the defendant and his

offense." Id. at 1482 (citing Lockett v. Ohio, 438 U.S. 586, 604 n.12 (1978)). "The

fears and passions of the jury cannot be excited by speculation as to what might

happen if the death penalty is withheld." Id.

    31.) Another erroneous and prejudicial theme within the State's closing

argument, was that of future dangerousness. The State's future dangerousness

argument (and the court's allowance of it) violated the Eighth and Fourteenth

---

[5]     Defense counsel offered no rebuttal to the State's suggestion that Petitioner should be sentenced to death in order to prevent others from committing similar

Amendment.  See generally Furman v. Georgia, 408 U.S. 238 (1972);  Gregg v. Georgia, 428 U.S. 153 (1976);  Woodson v. North Carolina, 428 U.S. 280 (1976). Although prosecutors enjoy some latitude in this area, that latitude is not intended to permit prosecutors carte blanche when arguing in favor of the death penalty.  "An argument that a death sentence is necessary to prevent future dangerous behavior by the defendant in prison must be based on evidence suggesting that the defendant will be dangerous in prison." Henry v. State, 278 Ga. 617, 619, 604 S.E.2d 826 (2004). "[I]t is improper for the [S]tate to argue that a defendant will kill in prison simply, because he killed while free." Id. at 619-620.  When the prosecution argues future dangerousness of a defendant based on opinion and conjecture, rather than on evidence adduced at trial, a defendant's due process rights are violated.  Id. at 619-620.

32.)    Another area of impropriety pertaining to the State's closing argument stems from the persistent, prejudicial comparisons of the "worth" of Petitioner in comparison to that of Deputy Dinkheller.  (T. at 1380, 1391).[6] The State's

---

crimes.  The failure to object to this unfounded claim by the State constituted ineffective assistance of counsel.

[6]      Such blatant appeals by the State to invoke the jury's emotions were clearly objectionable.  Yet, Petitioner's trial counsel neglected to object to this improper argument.  As such, trial counsel were ineffective for failing to make an effort to protect their client's right to a fair sentencing proceeding. Williams v. State, 261 Ga. App. 511, 583 S.E.2d 172 (2003)  (explaining that trial counsel's failure to

comparison of the human value of the two men amounts to improper victim impact evidence. Victim impact type evidence "shall be permitted only in a manner and to such a degree as not to flame or unduly prejudice the jury." See O.C.G.A. § 17-10-1.2; see also Payne v. Tennessee, 501 U.S. 808 (1991).

33.) Each of these improper arguments is sufficient to warrant a new sentencing hearing in this case. Taken together, these improper prosecutorial arguments demand a reversal, as they significantly infected the minds and hearts of Petitioner's jury. The prosecution's arguments were improper, unconstitutional, and violative of the prosecutor's duties.

> [T]he prosecutor is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done . . .. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to being a just one.

Berger v. United States, 295 U.S. 78, 88 (1935). See also Arthur v. State, 575 So. 2d 1165, 1186 (Al. Cr. App. 1990) (explaining that prosecutorial arguments must be

---

object may amount to ineffective assistance of counsel, even when trial counsel claims such omission to have been strategic).

limited to the evidence).

34.)     When a death sentence, such as Petitioner's, is predicated in part on materially inaccurate and improper argument, the sentence violates due process and the prohibition against cruel and unusual punishments.  Johnson v. Mississippi, 406 U.S. 578 (1988); Duest v. Singletary, 907 F. 2d 472, 483 (11th Cir. 1992).  The Court must find that the prosecution's improper and unsubstantiated arguments had a serious and prejudicial effect the outcome of the case, rendering Petitioner's death sentence unreliable.

35.)     In addition to improper arguments, the State engaged in other forms of misconduct.  For instance, the State suppressed information favorable to the defense at Petitioner's trial, including the conviction phase and the sentencing phase, and the materiality of the suppressed evidence undermines confidence in the outcome of the both phases of Petitioner's trial and his direct appeal, in violation of Brady v. Maryland, 373 U.S. 667 (1965), and Kyles v. Whitley, 115 S. Ct. 1555 (1995).[7]  See also Banks v. Dretke, 540 U.S. 668 (2004).  The State took advantage of Petitioner's ignorance of the undisclosed favorable information by arguing to the factfinders that

---

[7]     The State has a continuing obligation to disclose favorable evidence, which extends through post-conviction proceedings, and the State may be continuing to withhold favorable evidence from Petitioner.  Thomas v. Goldsmith, 979 F.2d 746, 749-50 (9th Cir. 1992); Banks v. Dretke, 540 U.S. 668 (2004).

which it knew or should have known to be false and/or misleading. United States v. Sanfilippo, 564 F.2d 176, 179 (5th Cir. 1977).

36.)  The State failed to disclose benefits or promises extended to State witnesses in exchange for their testimony and allowed its witnesses to convey a false impression to the trial judge and the jury; and there is a reasonable likelihood that the false impression could have affected the jury's deliberations and the fact-finders decisions. Giglio v. United States, 405 U.S. 150 (1972).

37.)  The State elicited false and/or misleading testimony from State witnesses in violation of Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173 (1959). The State's knowing presentation of false and/or misleading testimony violated Petitioner's rights under Mooney v. Holohan, 294 U.S. 103, 55 S. Ct. 340 (1935). The State knowingly or negligently presented false testimony in pretrial, guilt phase, penalty phase, and sentencing, and there is a reasonable likelihood that the false testimony could have affected the judgment of the jury at Petitioner's trial and sentencing. United States v. Agurs, 427 U.S. 97, 103 (1976). Regardless of whether the State knew or should have known that it was presenting false and/or misleading evidence, the mere presentation of such evidence and the jury's reliance upon such evidence at both phases of the trial deprived Petitioner of due process. Sanders v. Sullivan, 863 F.2d 218 (2d Cir. 1988). This pervasive state misconduct violated

Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[8]

38.) During voir dire, the prosecution improperly used its peremptory strikes to systematically exclude jurors on the basis of race and/or gender. Batson v. Kentucky, 476 U.S. 79 (1986); J.E.B. v. Alabama ex rel., 511 U.S. 127 (1994).[9]

39.) In addition, the State failed to disclose knowledge concerning defense counsel improprieties to the trial court and misled the court and presented improper

---

[8]      To the extent that the suppressed favorable evidence might have been available to Petitioner, but his counsel failed to obtain and effectively utilize the information, counsel was ineffective. Because the suppressed favorable evidence creates a reasonable probability of a different outcome at Petitioner's trial, Petitioner was prejudiced by the deficient performance of counsel in this regard. Strickland v. Washington.

Where Petitioner alleges ineffective assistance of counsel to establish cause and prejudice for the purpose of excusing any procedural default, Petitioner contends that the Strickland "reasonable probability" standard governs the determination of prejudice resulting from counsel's deficient performance. Any reliance on Turpin v. Todd, 268 Ga. 820, 493 S.E.2d 900, 907 (1997), to hold Petitioner to the "actual prejudice" standard set forth in United States v. Frady, 456 U.S. 152 (1982) is erroneous to the extent that Frady standard is construed to impose a higher standard of proof in showing prejudice than that set forth in Strickland v. Washington. Nevertheless, Petitioner contends that he prevails under the Frady standard in that the errors worked to his actual and substantial disadvantage, infecting his trial with error of constitutional dimension. Frady, 456 U.S. at 170.

[9]      To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

29

and inadmissible evidence to the jury at Petitioner's trial.[10]

40.)     The jury bailiff's and/or sheriff's deputies and/or other State agents who interacted with jurors at the trial engaged in improper communications with jurors which deprived Petitioner of a fair trial.  Turner v. Louisiana, 379 U.S. 466 (1965); Radford v. State, 263 Ga. 47, 426 S.E. 2d 868 (1993); Turpin v. Todd, 268 Ga. 820, 493 S.E. 2d 900 (1997).[11]

41.)     This misconduct rendered Petitioner's trial and sentencing proceedings unconstitutional and thus his conviction is unconstitutional and his death sentence unreliable.  The prosecution's misconduct violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence

---

[10]     To the extent that Petitioner's counsel failed to object to these improper comments and seek a mistrial or other appropriate relief, or to otherwise preserve objections to the State's argument and effectively present claims based on that argument in Petitioner's direct appeal, counsel was ineffective, and Petitioner was prejudiced thereby.  To the extent that the court attempted to cure the improper comments by instructing the jury, the court's instructions failed to cure the error and actually exacerbated it by drawing the jury's attention to the improper comments.  The trial court improperly failed to correct these errors on its own motion.

presented, habeas relief should follow.

## CLAIM THREE

**THE TRIAL COURT CONDUCTED PETITIONER'S TRIAL IN A MANNER THAT VIOLATED HIS RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

42.)     This Claim is evidenced by the following:

43.)     All other claims and allegations in this Petition are incorporated herein by specific reference.

44.)     The trial court conducted Petitioner's trial, both the guilt/innocence phase and the penalty phase, in a manner that violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and the Georgia Supreme Court failed to remedy these violations. These violations of Petitioner's constitutional rights include, but are not limited to, the following:

- failing to possess and employ an accurate and proper understanding of what constitutes mitigation and what constitutes aggravation;

- improperly questioning witnesses itself during the trial;

- allowing the introduction of illegally obtained statements and evidence;

---

[11]     To the extent the factual basis for this claim was available to defense counsel and counsel failed to raise and litigate this claim at trial or on appeal, counsel rendered deficient performance and Petitioner was actually prejudiced thereby.

- failing to curtail the improper and prejudicial arguments by the State;

- admitting into evidence various items of prejudicial, unreliable, unfounded, unsubstantiated and/or irrelevant evidence tendered by the State;

- considering improper and untruthful arguments by defense counsel;

- refusing to allow admissible evidence;

- imposing an unconstitutional and disproportionate sentence;

- improperly commenting on defense counsel's trial strategy and method of questioning witnesses;

- failing to require the State to disclose certain items of evidence in a timely manner so as to afford the defense an opportunity to conduct an adequate investigation;

- failing to require the State to disclose certain items of evidence of an exculpatory or impeaching nature to the defense;

- failing to ensure that the court-appointed expert was neutral and objective;

- allowing the State to present false and misleading testimony;

- failing to act upon known improprieties of defense counsel thereby allowing Petitioner to receive ineffective representation;

- failing to provide Petitioner with adequate counsel;

- impermissibly injecting comments during the testimony of witnesses;

32

- relying on a misunderstanding of the law in the court's rulings, report, and findings.

- excusing potential jurors for improper reasons under the rubric of "hardship;"

- restricting voir dire relating to several areas of inquiry;

- admitting into evidence prejudicial and irrelevant photographs;

- putting the burden on Petitioner to prove that he was not eligible for the death penalty;

- failing to inquire into the possibility of juror misconduct and to remedy such misconduct;

- refusing to give proper jury instructions requested by Petitioner;

- refusing to strike prospective jurors who were unqualified for reasons such as, but not limited to, bias against the defense;

- giving the jury erroneous and misleading instructions;

- providing the jury with misleading and prejudicial forms on which to note their verdicts and findings as to aggravation;

- permitting the jurors to interact with the alternate jurors during deliberations;

- improperly restricting the scope of voir dire;

- improperly rehabilitating prospective jurors;

- failing to maintain order in the courtroom by allowing emotional and prejudicial actions by members of the public in the courtroom and by witnesses while on the stand;

- failing to declare a mistrial or issue curative instructions when the State made improper and prejudicial statement in opening argument;

- allowing the prosecution to introduce improper, unreliable and irrelevant evidence including evidence of which the defense had not been provided adequate notice and which had been concealed from the defense.

45.)    Regarding the trial court's role during voir dire, under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is entitled to an impartial jury, and not merely to jurors who swear to be indifferent. Irvin v. Dowd, 266 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."); Smith v. Phillips, 455 U.S. 209, 221-22 (1982) (O'Connor, J., concurring) ("[A] juror may have an interest in concealing his own bias and . . . the juror may be unaware of it."); United States v. Davis, 586 F.2d 190 (5th Cir. 1978) ("[A juror] is poorly placed to make a determination as to his own impartiality."); Lively v. State, 262 Ga. 510, 421 S.E. 2d 528 (1992).  The Constitution requires that a juror appear to be, as well as be, unbiased.  Aldridge v. United States, 283 U.S. 308, 315 (1931) ("[It is] more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve."); Estelle v. Williams, 425 U.S. 501, 503-04 (1976); Edwards v. Griner, 42 Ga. App. 282, 155 S.E. 2d 789 (1930) ("[J]urors should come to the

34

consideration of a case free from even a suspicion of prejudgment.").  When the life or death of a criminal defendant is at stake, absolute neutrality on the part of the jurors is especially critical. See generally  Gardner v. Florida, 430 U.S. 349, 358 (1978); Turner v. Murray, 476 U.S. 28 (1986).  The court failed to provide Petitioner with such a neutral jury.

46.)    The trial court's errors denied Petitioner the rights and protections provided by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[12]  As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

### CLAIM FOUR

**MISCONDUCT ON THE PART OF THE JURORS AT PETITIONER'S TRIAL VIOLATED HIS RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

47.)    This Claim is evidenced by the following:

48.)    All other claims and allegations in this Petition are incorporated herein by specific reference.

49.) Misconduct on the part of the jurors included, but was not limited to, improper consideration of matters extraneous to the trial, improper racial attitudes which infected the deliberations of the jury, false or misleading responses of jurors on voir dire, improper biases of jurors which infected their deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, improper communication with jury bailiffs, improper ex parte communications with the trial judge, and improper prejudgment of Petitioner's guilt, his defense, and his claims.[13] See e.g., Spencer v. Georgia, 500 U.S. 960 (1991) (Kennedy, J., concurring in denial of cert) (racial epithets used in jury room); McCleskey v. Kemp. 481 U.S. 279 (1987) (racial animus of decision makers); Moore v. State, 324 S.E. 2d 760 (Ga. App. 1984) (jury consideration of extraneous legal research); Jones v. Kemp, 706 F. Supp. 1534 (N.D. Ga. 1989) (jury consideration of extraneous religious information); Turner v. Louisiana, 379 U.S.

---

[12]   To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

[13]   To the extent that Petitioner's counsel failed to protect Petitioner's rights in this regard, trial counsel's performance was unreasonably deficient, and Petitioner was prejudiced by the deficiencies of his counsel.  To the extent that the trial court was implicated in or aware of any of the jury misconduct, and yet failed to advise Petitioner's counsel or correct the misconduct, the court's actions constitute an independent violation of Petitioner's rights.  To the extent that the State, through any of its entities, was implicated in or aware of any of the jury misconduct, the State's action (or failure to act) also deprived Petitioner of his constitutional rights.

466 (1965) (improper communications with bailiffs); <u>Rushen v. Spain</u>, 464 U.S. 114 (1983) (improper communications with trial judge); <u>United States v. Scott</u>, 854 F.2d 697, 700 (5th Cir. 1988) (failure to respond truthfully on voir dire); <u>Radford v. State</u>, 426 S.E.2d 868 (Ga. 1993) (improper communications with bailiffs); <u>Turpin v. Todd</u>, 493 S.E.2d 900 (Ga. 1997) (same).[14]

50.)    One example of the juror misconduct arose during the jury qualification process when prospective juror Darrell Lampkin was asked by counsel for Petitioner, "now, when you came in for general instructions, Judge Towson said to you that should he be convicted, that the jury would be involved in the sentencing process. Do you understand that the jurors individually would have to vote for a death sentence?"  Juror Lampkin responded, "yes, that's what everybody in the back was talking about."  (T. 166).  Mr. Lampkin explained further that he was not the prospective juror who initiated the discussions concerning the sentencing procedure. When pressed, however, he declined to reveal the contents of the discussions. (T. 168).

51.)    At the request of defense counsel, fifteen of the sixteen members of the panel were then brought into the courtroom and placed in the jury box. Juror

---

[14]    To the extent that Petitioner's counsel failed to argue, develop, or present these issues, failed to adequately preserve objections thereto, or failed to

37

Lampkin, the juror who revealed the discussions, was left out of the process. The jurors were reminded of the court's instructions and as a group were asked whether any discussions occurred. Juror Allen Tucker was the only juror who responded affirmatively. The others made no response. He was asked to remain in the courtroom and the other jurors were returned to the jury room to be called out one by one. (T. 181-189).

52.)    Juror Tucker is an attorney. Referring to juror Lampkin, he informed the trial court that "the gentleman that was in here before the court earlier, first breached the subject as to the defendant's guilt or innocence . . ., it's my opinion that he had already formed an opinion as to this man's guilt or innocence. . . ." (T. 176). Juror Tucker revealed that there were comments by other jurors in response to Mr. Lampkin's statements however felt that those other jurors were not tainted by the discussions.  (T. 177).

53.)    The court brought out the remaining jurors one by one and questioned them. Rather than asking the jurors to reveal the nature of the discussions, the identity of the participants in the discussions and whether they were influenced at all, as requested by defense counsel (T. 169-170), the court limited its inquiry to whether the individual jurors could put aside anything heard or said and render a fair

---

effectively litigate these issues on direct appeal, Petitioner's counsel rendered

and impartial verdict if selected.  (T. 181-189).  The court then reiterated its often-given instructions prohibiting discussions among the jurors and denied defendant's challenge to the panel.  (T. 189-191).

54.)  After questioning the prospective juror, the trial court was faced with three conflicting versions of what occurred.  Juror Lampkin swore that everyone in the jury assembly room discussed the sentencing process. Juror Tucker characterized the participation of the other jurors as responding to Mr. Lampkin's comments and concluded that Mr. Lampkin had formed an opinion as to Petitioner's guilt. (T. 176-177).  The remaining fourteen jurors, however, when questioned as a group, remained silent as to whether any discussions had occurred. (T. 175, 178).  The three versions do not allow an accurate and reliable conclusion regarding the actual scope and content of the improper jury discussions.  The trial court heard from two jurors, Mr. Lampkin and Mr. Tucker, that the discussions were broader than the silence of the other fourteen would indicate.  However, the court never directed individual questions to the fourteen others who were sequestered together for three or four hours during the tedious qualification process about what was said and by whom.

55.)  Based upon jurors Lampkin and Tucker's responses, it is reasonably certain that discussions did occur.  An inference of taint thereby exists.  The trial

---

ineffective assistance, and Petitioner was prejudiced thereby.

court's very limited voir dire accomplished nothing toward removing that taint. The fourteen jurors' denial and their rote responses to the trial court's leading question about a fair and impartial verdict should not have ended the trial court's inquiry.

56.) Judge Towson's denial of the challenge to the poll was harmful to the defendant. When faced with information that other members of the panel engaged in prohibited discussions, the defendant exercised four peremptory strikes to the affected panel against jurors Merritt, Holcomb, Worst, and Taylor and ultimately exhausted all of his strikes. (T. 1156). To date we still do not know to which jurors Mr. Lampkin and Mr. Tucker were referring or what they said.

57.) It is difficult to conceive of comments more prejudicial than comments which were sufficient to lead juror Tucker to conclude that juror Lampkin had fixed opinions regarding Petitioner's guilt. It cannot be said that the discussions among the jurors were harmless beyond a reasonable doubt. Defendant's conviction should be reversed. Sims v. State, 467 S.E.2d 574 (Ga. 1996).

58.) This misconduct rendered Petitioner's trial unconstitutional and thus his conviction and death sentence unreliable. The jury's misconduct violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is

based upon an unreasonable determination of the underlying facts in light of the

evidence presented, habeas relief should follow.

## CLAIM FIVE

**A DEATH SENTENCE IN THIS CASE IS DISPROPORTIONATE PUNISHMENT, AND SUCH ARBITRARY APPLICATION OF THE DEATH PENALTY VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

59.) This Claim is evidenced by the following:

60.) All other claims and allegations in this Petition are incorporated herein by specific reference.

61.) When the United States Supreme Court initially banned the use of the death penalty in 1972, primary among its reasons was the arbitrariness of its application. Furman v. Georgia, 408 U.S. 238 (1972). Without clarity about the consistency of the application of capital punishment, the death penalty became untenable and was subject to "wanton[]" and "freakish[]" imposition, according to Justice Potter Stewart. Furman, at 310 (Stewart, J., concurring). Justice Stewart also found that the death sentences at issue were "cruel and unusual in the same way that being struck by lightning is cruel and unusual." Id. at 309.

62.) The Supreme Court later upheld Georgia's new death penalty scheme since it aimed at eliminating arbitrariness through narrowing factors that limited application of capital punishment to only the most aggravated homicides, and since it came with the promise of careful proportionality review by Georgia's Supreme

42

Court.  Gregg v. Georgia, 428 U.S. 153, 196-98 (1976).  The latter is required under

Georgia law; the Supreme Court must "review each sentence of death and determine

whether it was imposed under the influence of passion or prejudice, whether the

evidence supports the jury's finding of a statutory aggravating circumstance, and

whether the sentence is disproportionate compared to those sentences imposed in

similar cases."  Id. at198; O.C.G.A. § 17-10-35(a).

63.)    In Zant v. Stephens, the United States Supreme Court again

emphasized the necessity of proportionality review to "protect against the wanton

and freakish imposition of the death penalty."  Zant v. Stephens, 462 U.S. 862,876,

890 (1983).  The Court also discussed the need for effective proportionality review

to include a comparison of cases in which both death and life sentences were

imposed.  Id. at 889 n.26, 880 n.19.

64.)    Unfortunately, however, the promise of such review has lapsed.

Proportionality review by the Georgia Supreme Court has deteriorated and is no

longer reliable.  The court has failed to ensure proper review of cases and has instead

performed only perfunctory and meaningless oversight.  As a result, the capital

punishment scheme in Georgia remains arbitrary and capricious in violation of the

Eighth Amendment and other state and federal constitutional guarantees.

65.)    Justice John Paul Stevens recently addressed this issue squarely in

43

describing the Georgia Supreme Court's review process:

> Rather than perform a thorough proportionality review to mitigate the heightened risks of arbitrariness and discrimination in this case, the Georgia Supreme Court carried out an utterly perfunctory review. Its undertaking consisted of a single paragraph, only the final sentence of which considered whether imposition of the death penalty in this case was proportionate as compared to the sentences imposed for similar offenses. And even then the court stated its review in the most conclusory terms: "The cases cited in the Appendix support our conclusion that [petitioner's] punishment is not disproportionate in that each involved a deliberate plan to kill and killing for the purpose of receiving something of monetary value." Id., at 782, 653 S. E. 2d, at 447–448. The appendix consists of a string citation of 21 cases in which the jury imposed a death sentence; it makes no reference to the facts of those cases or to the aggravating circumstances found by the jury.

66.) <u>Walker v. Georgia</u>, 2008 WL 2847268, 2 (U.S. Ga. 2008) (Statement of Stevens, J., respecting the denial of the petition for writ of certiorari).

67.) Justice Stevens went on to admonish the Georgia Supreme Court for failing to expand its proportionality inquiry to include cases in which either the jury imposed a life sentence or the state did not even seek death, since "[c]ases in both of these categories are eminently relevant to the question whether a death sentence in a given case is proportionate to the offense." <u>Id.</u> at 3 (citation omitted). Justice Stevens further concluded: "The Georgia Supreme Court's failure to acknowledge these or any other cases outside the limited universe of cases in which the defendant

44

was sentenced to death creates an unacceptable risk that it will overlook a sentence infected by impermissible considerations." Id. (citation omitted).

68.)   The same sort of perfunctory review described by Justice Stevens characterized the Georgia Supreme Court's proportionality review in Petitioner's case.  Brannan v. State, 561 S.E. 2d 414 (Ga. 2002).

69.)   For a time following Gregg, the Georgia Supreme Court considered cases resulting in life sentences when conducting proportionality review, and the United States Supreme Court duly noted this practice.  See Gregg, 429 U.S. at 205 n.56 (noting that the Supreme Court of Georgia "does consider appealed murder cases where a life sentence has been imposed" in conducting its proportionality review); Zant, 462 U.S. at 889 n.19 (quoting the Supreme Court of Georgia's statement in Stephens v. State, 227 S.E.2d 261, 263 (Ga. 1976) that "[i]n performing the [statutorily mandated proportionality review], this court uses for comparison purposes not only similar cases in which death was imposed, but similar cases in which death was not imposed").

70.)   The Georgia Supreme Court never undertook such review in Petitioner's case. The court neglected to compare Petitioner's case to other cases which were either more aggravated or as aggravated, but which nonetheless received sentences of less than death.  The Court's failure to consider such cases is significant

45

because doing so could serve as powerful evidence of the disproportionate nature of Petitioner's sentence. The lack of meaningful proportionality review by the Georgia Supreme Court was in error. The need for thorough and searching review is heightened by the essential facts of the offense at hand and the unrebutted evidence of Petitioner's severe mental illness. A death sentence on this record would be clearly arbitrary and capricious by failing to distinguish why Petitioner deserves a death sentence, when compared to other more culpable defendants who received life imprisonment despite committing more aggravated crimes with less mitigating evidence. Accordingly, this Court should reverse Petitioner's sentence of death.

71.) The lack of a meaningful proportionality review of Petitioner's sentence violated his rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[15] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

## CLAIM SIX

---

[15] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

**THE DEATH PENALTY IN GEORGIA IS IMPOSED ARBITRARILY AND CAPRICIOUSLY AND AMOUNTS TO CRUEL AND UNUSUAL PUNISHMENT, VIOLATING PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

72.)   This Claim is evidenced by the following:

73.)   All other claims and allegations in this Petition are incorporated herein by specific reference.

74.)   Petitioner's sentence of death was imposed arbitrarily and capriciously, and pursuant to a pattern and practice of discrimination in the administration and imposition of the death penalty in Georgia, thereby rendering his sentence of death unlawful and in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth

75.)   Amendments to the United States Constitution and the corresponding provisions of the Georgia Constitution.

76.)   Georgia's statutory death penalty procedures, as applied, do not result in fair, nondiscriminatory imposition of the death sentence, and therefore violate the Eighth Amendment to the United States Constitution and the corresponding provisions of the Georgia Constitution.

77.)   The death penalty is imposed arbitrarily, capriciously, and discriminatorily in the State of Georgia, and was so imposed in Petitioner's case.

78.)   Georgia cases similar to that of Petitioner with regard to both the nature

47

and circumstances of the offense, prior record, culpability, and life and character of

the accused, have resulted in lesser punishments than death. Georgia cases more

aggravated than that of Petitioner with regard to both the nature and circumstances

of the offense, prior record, culpability, and life and character of the accused, have

resulted in lesser punishments than death. There is no constitutionally-permissible

way to distinguish the few cases in which the death penalty has been imposed, and

Petitioner's case in particular, from the many similar cases in which a lesser

punishment has been imposed.

79.) There exists in Georgia a pattern and practice of prosecuting authorities,

courts, and juries to discriminate on the basis of race, gender, and poverty in

deciding whether to seek or impose the death penalty in cases similar to that of

Petitioner, thereby making the imposition of the sentence of death against Petitioner

a violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments

to the United States Constitution.[16] As the failure of the state court to grant relief on

this claim is contrary to or an unreasonable application of Supreme Court authority

or is based upon an unreasonable determination of the underlying facts in light of the

evidence presented, habeas relief should follow.

## CLAIM SEVEN

---

[16] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

48

**PETITIONER WAS DENIED ACCESS TO COMPETENT EXPERT ASSISTANCE IN VIOLATION OF AKE V. OKLAHOMA, 470 U.S. 68 (1985), AND HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

80.) This Claim is evidenced by the following:

81.) All other claims and allegations in this Petition are incorporated herein by specific reference.

82.) A criminal defendant is entitled to competent expert psychiatric assistance when the state makes his mental state relevant to guilt-innocence or sentencing. Ake v. Oklahoma, 470 U.S. 68 (1985). According to Georgia law, Petitioner's mental condition is relevant to guilt/innocence and sentencing in many ways: (a) whether he had the specific intent to commit malice murder; (b) whether he had an abandoned or malignant heart to commit malice murder; (c) whether he had the ability to rationally communicate with his attorney and make rational choices about his representation; (d) whether he had the ability to appreciate the wrongfulness of his conduct and conform his conduct to the dictates of the law; (e) whether he had the ability to knowingly and rationally waive the right to counsel prior to making a statement; (f) the applicability and appropriateness of a guilty but mentally ill verdict; (g) applicability and appropriateness of a not guilty by reason of insanity verdict; (h) whether Petitioner had the ability to waive right to remain silent;

49

(i) a myriad of mitigating factors; and (j) aggravating factors. Furthermore, Petitioner's mental condition was his sole defense at trial. Petitioner was entitled to professionally competent and independent mental health assistance on these issues at both the guilt phase and sentencing phase of his trial.

83.) The mental health professionals, who testified at Petitioner's trial did not perform a competent mental health evaluation, and trial counsel failed to provide the relevant records and other assistance needed to make such a competent evaluation. The right to competent psychiatric expert assistance is explicit in <u>Ake</u>, and was recognized by the Georgia Supreme Court in <u>Curry v. Zant</u>, 371 S.E. 2d 647 (Ga. 1988). In <u>Curry</u>, the court granted relief to a capital habeas corpus petitioner for two reasons. First, trial counsel had failed to obtain available independent expert psychiatric assistance. Second, the competency evaluation conducted at Central State Hospital had been incompetently performed. The <u>Curry</u> Court quoted from the affidavits of post-conviction psychiatric experts who had examined petitioner, and who had analyzed the evaluation conducted pre-trial on the issue of competency. According to the first expert:

> I am of the firm opinion that an independent evaluation of Walter would have been invaluable to a jury trying his case. My reasons for this belief are as follows: the record contains gross factual inaccuracies and is replete with presumptive statements for which there is little or only circumstantial evidence to substantiate either the veracity

50

or appropriateness of the claims made; the results of the evaluation are based on an incomplete assessment of Walter because he was not administered a comprehensive battery of tests to adequately evaluate him; also related to Walter's psychological assessment, the qualifications of the examiner who administered the tests to him and interpreted and reported the test results, were limited to a bachelor's (B.A.) degree; the evaluation as a whole, as reflected in the documentation of that evaluation, was conducted by individuals who demonstrated an apparent lack of familiarity with contemporary psychiatric knowledge and understanding, crucial to an appreciation of Walter's condition

Curry, 258 Ga. at 528, 371 S.E. 2d at 648 (citation omitted).

84.)    According to the second post-conviction expert, Mr. Curry "was given an inadequate examination at Central State Hospital." Id.  The Court properly ordered a new trial for Mr. Curry.  See also State v. Sireci, 536 So. 2d 231, 233 (Fla. 1988) ("The failure of the Court appointed psychiatrist to discover these circumstances [brain damage] and to order additional testing based on the circumstances known deprived the defendant of due process by denying him the opportunity through an appropriate psychiatric examination to develop factors in mitigation of the death penalty."); Mason v. State, 502 So. 2d 734 (Fla. 1986).

85.)    In Petitioner's case, the mental health professionals were hindered in their ability to perform a competent evaluation by defense counsel's failure to provide them with adequate background information about Petitioner's and the

limitations placed on the evaluators by the court and/or trial counsel. Had adequate and appropriate background information been presented to the mental health professionals, there is a reasonable probability that the outcome of Petitioner's trial would have been different.

86.) The Due Process Clause requires protection of a criminal defendant's rights to adequate mental health assistance as a manner of fundamental fairness, in order to assure reliability in the truth determining process. Ake v. Oklahoma, 470 U.S. 68, 79-86 (1985). As the Court explained in Ake, the provision of competent, independent and informed psychiatric expertise to a defendant assures the defendant "a fair opportunity to present his defense" and also "enable[s] the jury to make its most accurate determination of the truth on the issue before them." Id. at 76, 81. When counsel failed to assure that the mental health professionals were adequately informed and were performing competently, counsel deprived Petitioner of a basic tool with which to present his defense – a tool to which he was entitled under the Constitution; Petitioner was sentenced to death and then determined to be eligible for the death penalty as a result of counsel's failures.[17]

87.) The lack of critical, independent expert assistance violated Petitioner's

---

[17] To the extent trial counsel failed adequately to raise and/or litigate these issues at trial or on appeal, counsel rendered ineffective assistance of counsel and Petitioner was actually prejudiced thereby.

52

rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

States Constitution.  As the failure of the state court to grant relief on this claim is

contrary to or an unreasonable application of Supreme Court authority or is based

upon an unreasonable determination of the underlying facts in light of the evidence

presented, habeas relief should follow.

### CLAIM EIGHT

**PETITIONER WAS DENIED DUE PROCESS OF LAW WHEN THE SAME JURY THAT CONVICTED HIM WAS RESPONSIBLE FOR DETERMINING THE APPROPRIATE SENTENCE IN VIOLATION OF HIS RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

88.)    This Claim is evidenced by the following:

89.)    All other claims and allegations in this Petition are incorporated herein

by specific reference.

90.)    In Petitioner's case, the trial court should have bifurcated the

guilt/innocence proceedings and the sentencing proceedings by empaneling two

different panels of jurors, one panel to hear evidence on the issues of guilt or

innocence and the other panel to make a determination of sentence in the event that

the defendant were to be convicted.

---

91.) In death penalty cases, all jurors are "death-qualified," a process by which those unable to impose a death sentence and those who will automatically impose death are excluded. This process is often referred to as Witherspoon voir dire, named for the opinion of the United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed.2d 776 (1968). For example, O.C.G.A. § 15-12-164 (a)(4) requires that the jurors be asked whether they are opposed to capital punishment.[18] During this process, the jurors who must first decide the issue of the defendant's guilt or innocence are also being asked to consider whether or not they would be able to inflict a particular punishment. Those jurors who are "death qualified" are undoubtedly predisposed to convict a defendant because, before the court makes a final determination as to the jurors' qualifications by asking the statutory questions, the jurors are subjected to questions from each side concerning each juror's opinions about the efficacy of the different choices of punishment. The presumption that the defendant is not guilty is entirely subordinated to the issue of punishment. The jurors are essentially told that the system considers the defendant guilty and the jurors must therefore be queried as to

---

[18] Incidentally, this question does not elicit other points of view on the death penalty that could interfere with their ability to be fair and impartial, see e.g., Pope v. State, 256 Ga. 195, 345 S.E.2d 831 (1986), nor does it elicit answers as to a juror's ability to set aside any personal views and decide the case on the evidence.

54

their opinions on punishment before they have had a trial to determine guilt or innocence. In fact, they are being probed about the death penalty before they are asked a single question about the case they may be selected to try.

92.) It is clear that if a prospective juror is repeatedly asked if he is prepared to vote for the execution of an individual, he will no longer presume that the jury will be deciding only guilt/innocence. Inherent in the questioning on punishment is the assertion that this case will proceed to the penalty phase of trial. The reasonable, "death-qualified" juror will be prepared not only to reach that phase, but also be more likely to convict that individual. Logic and common sense dictate that the juror's attention is focused, before hearing any evidence about the guilt or innocence of the defendant, on what the punishment should be. The focusing of the juror's attention on punishment before he or she has been asked to determine whether or not the defendant is even guilty of the offenses for which he has been charged means that he has been denied the right to a "fair trial by a panel of impartial, 'indifferent' jurors." A failure to afford a criminal defendant this right "violates even the minimal standards of due process." Morizan v. Illinois, 504 U.S. 719, 727, 112 S. Ct. 2222, 2228, 119 L. Ed.2d 492 (1992) (quoting Irvin v. Dowd, 366 U.S. 717, 711, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). "Jurors should come to a case free from

---

Gray v. Mississippi, 481 U.S. 648 (1987); 469 U.S. 810 (1985); David v. Georgia,

even a suspicion of prejudgment of the issues to be tried -as to the parties, the subject matter, or the credibility of witnesses." <u>Parisie v. State</u>, 178 Ga. App. 857, 344 S.E. 2d 727, 729 (1986).

93.)    The inherent prejudice to a defendant in a death penalty trial was recognized in the Eighth Circuit case of <u>Grigsby v. Mabry</u>, 758 F.2d 226 (8th Cir. 1985).  Although the United State Supreme Court reversed <u>Grigsby</u> on a Sixth Amendment issue, the case is still instructional for this court because Petitioner's claim is grounded in the fact that the denial of a bifurcated trial in a death penalty case violates the Eighth Amendment's prohibitions against cruel and unusual punishment.  <u>See Lockhart v. McCree</u>, 476 U. S. 162, 106 S. Ct. 175 8, 90 L. Ed. 2d 137 (1986) (holding that the removal for cause at guilt phase of persons whose attitudes toward capital punishment would prevent or substantially impair the performance of their duties at the punishment phase does not violate the Sixth Amendment right to an impartial jury or to a jury drawn from a fair cross-section of the community).  Further, although a process whereby <u>Witherspoon</u> jurors are excluded from service with impunity is not violative of the Sixth Amendment's right to have a cross-section of the community, a process whereby an individual is sentenced to death by a juror who is conviction-prone is, in fact, violative of the

---

429 U.S. 122 (1976).

Eighth Amendment's protection against cruel and unusual punishments.

94.)   Finally, Petitioner's right to due process was violated when the jury that had rejected Petitioner's guilt phase defenses, had convicted him, and had necessarily developed a bias against the credibility of the Petitioner and Petitioner's counsel, was then expected to sit as fair and impartial decision-makers on the sensitive issue of penalty.  Because a separate penalty phase jury should have been empaneled, Petitioner was denied due process of law, in violation the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[19]  As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[19]    To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM NINE

**PETITIONER WAS DENIED DUE PROCESS OF LAW BY THE INSTRUCTIONS GIVEN TO THE JURY AT THE GUILT/INNOCENCE PHASE OF THE TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

95.)   This Claim is evidenced by the following:

96.)   All other claims and allegations in this Petition are incorporated herein by specific reference.

97.)   The trial court's instructions to the jury in the guilt/innocence phase of Petitioner's trial violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  The trial court erred in numerous ways during its charge to the jury including, but not limited to:

- incorrectly charging the jury on the burden of proof beyond a reasonable doubt, permitting the jury to convict Petitioner upon less than "utmost certainty" of guilt;

- giving an unconstitutionally vague definition of guilty but mentally ill;

- charging that the defendant was presumed to be of sound mind and failing to advise how that presumption could be rebutted;

- instructing the jury on inappropriate and inapplicable matters;

- giving an unconstitutionally vague and misleading definition of insanity;

58

- incorrectly instructing the jury on the consequences of certain verdicts;

- incorrectly instructing the jury on who would take custody of Petitioner if convicted under a guilty but mentally ill verdict;

- suggesting to the jury that mental illness is not a factor in determining whether Petitioner was insane;

- improperly instructing the jury on charges which merged into one offense;

- failing to instruct the jury on lesser included offenses;

- improperly instructing the jury to not be swayed by sentiment, sympathy, prejudice, or other factors;

- improperly charging vague and essentially standardless definitions of statutory terms; and

- improperly charging the jury on the offenses charged in the indictment.

98.)   These erroneous and improper instructions violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[20]  As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[20]      To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

59

## CLAIM TEN

**PETITIONER WAS DENIED DUE PROCESS OF LAW BY THE INSTRUCTIONS THAT WERE GIVEN TO THE JURY AT THE AGGRAVATION/MITIGATION PHASE OF TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

99.)    This Claim is evidenced by the following:

100.)   All other claims and allegations in this Petition are incorporated herein by specific reference.

101.)   The sentencing phase jury instructions in this case, both individually and collectively, were ambiguous, insufficient, vague, and confusing, contrary to law and the sentencer's decision based upon these instructions is unreliable, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### A.    **Mitigating Circumstances**

102.)   The trial court improperly instructed the jury regarding the definition of mitigating evidence, to wit:

> You shall also consider the facts and circumstances, if any, in extenuation, mitigation or aggravation of punishment.  Mitigating or extenuating facts or circumstances are those which you the jury find do not constitute a justification or excuse for the offense in question, but which, in fairness and mercy, may be

60

> considered as extenuating or reducing the degree of
> moral culpability or blame.

(T. Vol. 6 at 1440).  The court's definition of mitigation is too preclusive in that the sentencer is restricted to offense-related mitigation, and cannot consider background and social history as mitigation.  In Lockett v. Ohio, the United States Supreme Court held that the defendant in a capital trial has the right to introduce virtually any evidence in mitigation during the penalty phase of trial.  438 U.S. 586 (1978).  Any instruction arbitrarily limiting what may be considered as mitigation, as was given here, is unconstitutional.  The court also instructed the jury that it should "consider the facts and circumstances, if any, in extenuation, mitigation, or in aggravation of punishment."  (T. Vol. 6 at 1440 (emphasis added)).  This instruction improperly implied to the jury the court's belief that no facts warranting mitigation existed and invaded the province of the jury.

103.)  A jury instruction on mitigating circumstances is constitutionally invalid if there is any "reasonable possibility that a juror will misunderstand the meaning and function of mitigating circumstances."  Peek v. Kemp, 784 F.2d 1479, 1494 (11th Cir.), cert. denied, 479 U.S. 939 (1986).  Where mitigating evidence is present, "the absence of any explanatory instructions on mitigation creates a reasonable possibility that the jury misunderstood the meaning and the function of the mitigating evidence in the sentencing deliberations."  Cunningham v. Zant, 928

F.2d 1006, 1012 (11th Cir. 1991).

104.)  At Petitioner's sentencing hearing, the trial court failed to (1) provide even the most basic examples of mitigating circumstances; (2) explain that even a minimum quantum of mitigating evidence, under the law, could be considered by the jury in reaching a life sentence; (3) explain that anything could be considered in mitigation; (4) explain that unlike the guilt/innocence phase of the trial, there was no need for the jury to weigh mitigating evidence against any aggravating evidence; and (5) explain that mitigating circumstances could be relevant to punishment and not merely the degree of culpability or blame.

105.)  There is no constitutional requirement that evidence mitigating against a sentence of death be introduced at the penalty phase, as opposed to the guilt phase. The Eighth Amendment mandates that a capital sentencing jury be free to consider any mitigating evidence, irrespective of who introduces it, when it is introduced, or how it is introduced.  See, e.g., Franklin v. Lynaugh, 108 S. Ct. 2320, 2334 (1988) (jury permitted to consider evidence presented at the guilt phase when considering sentence).  There was evidence relevant to mitigation presented to Petitioner's jury, though not adequately presented as such due to the ineffective performance of Petitioner's counsel.  His jury, however, was not told what mitigating evidence was, why it should be considered, or its significance.  Nor was the jury provided helpful,

concrete examples of a mitigating circumstance.  Cf. Peek, 784 F.2d at 1490-91.

Because there was mitigating evidence presented, "the absence of any explanatory

instructions on mitigation create[d] a reasonable possibility that the jury

misunderstood the meaning and function of the mitigating evidence in the

sentencing deliberations."  Cunningham, 927 F.2d at 1012.

106.)  The sentencing phase instruction on mitigating circumstances thus

effectively violated the rule established in the companion cases of Lockett v. Ohio,

438 U.S. 58 (1978) and Bell v. Ohio, 438 U.S. 586 (1978).  Lockett and Bell

invalidated the Ohio death penalty statute because it did not permit sufficient

individualized consideration of mitigating factors.  Lockett held that the Eighth and

Fourteenth Amendments require that a sentencing jury must not be precluded from

considering any relevant mitigating factor.  438 U.S. at 604.   In a subsequent case,

Eddings v. Oklahoma, 455 U.S. 104 (1982), the Court reaffirmed the holding in

Lockett and vacated the death sentence because, as in Petitioner's case, "it was as if

the trial judge had instructed a jury to disregard the mitigating evidence [the

defendant] proffered on his behalf."  Eddings, 455 U.S. at 114.

107.)  One of the most fundamental Eighth Amendment principles is that the

jury's discretion in a capital case must be guided by objective standards, see Godfrey

v. Georgia, 446 U.S. 420, 428 (1980), and that the sentencer cannot be precluded

from considering, as a mitigating factor, any aspect of the defendant's character or record or any of the circumstances of the offense. <u>Lockett v</u>. <u>Ohio</u>, 438 U.S. 586 (1978). Furthermore, the instructions at the penalty phase of a capital case must provide the jury with a "vehicle for expressing its reasoned 'moral response' to any available mitigating evidence" relevant to the defendant's "background or character or the circumstances of the crime." <u>Franklin v. Lynaugh</u>, 487 U.S. 164 (1988) (O'Connor J., concurring). The Court reaffirmed its commitment to this basic principle in <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989). Thus, beyond simply allowing a defendant to present mitigating evidence, "[t]he sentencer must also be able to consider and give effect to that evidence in imposing sentence." <u>Penry v. Lynaugh</u>, 492 U.S. at 319.

108.) In <u>Penry</u> the Court held that the Texas instructions before it were defective, because they did not provide the jury with a mechanism to consider Penry's evidence of mental retardation and child abuse. The Court concluded:

> In this case, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision. Our reasoning in Lockett and <u>Eddings</u> thus compels a remand for resentencing so that we do not 'risk that the death penalty will be imposed in spite of factors which may

64

call for a less severe penalty.' <u>Lockett</u>, 438 U.S. at 605;
<u>Eddings</u>, 455 U.S. at 119 (concurring opinion). When
the choice is between life and death, that risk is
unacceptable and incompatible with the commands of the
Eighth and Fourteenth Amendments. <u>Lockett</u>, 438 U.S. at
605.

<u>Penry v. Lynaugh,</u> 109 S. Ct. at 2952.

109.)  As in <u>Penry</u>, the jury instructions here failed to explain adequately the

nature and function of mitigating circumstances and also created a constitutionally

impermissible risk that his sentencing jury failed to consider available mitigating

circumstances, though they may not have been adequately presented as such by

defense counsel.  This is especially true in this case because the Georgia death

penalty statute does not include statutory mitigating circumstances.  In this case, the

prosecutor lectured the jurors on each of the aggravating circumstances he wanted

them to find.  (T. Vol. 6 at 1361-63).  The trial court then gave the jury a lengthy

charge on specific aggravating circumstances (T. Vol. 6 at 1441-44), as well as a

copy of the statutory aggravating circumstances charges (R. Vol. 3 at 1179), but

gave the jury only brief, vague language regarding mitigating circumstances.  Thus it

is possible that a reasonable jury could have failed to understand that it could

consider any aspect of Petitioner's character and background in mitigation of

punishment.

110.)  The Supreme Court has consistently made it clear that jury instructions

which preclude the sentencer's consideration of mitigating circumstances violate the Eighth Amendment.  See, e.g., Hitchcock v. Dugger, 481 U.S. 393 (1987).  Peek is not to the contrary.  The relevant part of the court's instructions in Peek not only were considerably more detailed than the charge in this case, but, significantly, the trial judge gave the jury an example of a mitigating circumstance, the absence of a prior criminal record.  So while the charge in Peek contained a "helpful, common sense example of aggravating and mitigating evidence," 748 F.2d at 1490, the same cannot be said of the charge in this case.  Furthermore, after the en banc court of the Eleventh Circuit decided Peek, the United States Supreme Court has decided Hitchcock v. Dugger, Mills v. Maryland, Franklin v. Lynaugh, and Penry.  These decisions make it clear that a court must carefully scrutinize the instructions at the penalty phase of a capital trial in order to insure that all mitigating evidence is properly considered.  Careful scrutiny of the record of Petitioner's sentencing proceeding demonstrates that the instructions given there insured that the available mitigating evidence would not be considered by his jury.  Petitioner's death sentence cannot stand.

## B. **Aggravating Circumstances**

111.)  The trial court's ambiguous instructions concerning aggravating circumstances led the jurors to believe they could sentence Petitioner to death

66

without finding any statutory aggravating circumstances.  The court charged as follows: "You shall also consider the facts and circumstances, <u>if any</u>, in extenuation, mitigation, or aggravation of punishment.  (T. Vol. 6 at 1440 (emphasis added)).  Such an instruction was confusing and misleading, in that the jurors were told that they could sentence Petitioner to death in the absence of any aggravating circumstances.  While the court repeatedly instructed the jury that it could sentence Petitioner to death if it found an aggravating circumstance or circumstances, the court's failure to instruct the jurors on what constituted mitigating evidence resulted in a jury charge that instructed the jurors how to sentence Petitioner to death, but failed to instruct them how to sentence him to life.  The court went to great length to instruct the jury on aggravating factors and provided the jury with copies of the aggravating factors and the verdict form, which also included the aggravators. (T. Vol. 6 at 1441-44; R. Vol. 3 at 1179).[21]  Noticeably absent from the court's instruction, however, was the idea that the mitigating circumstances could reduce the <u>punishment</u>, and not just the moral culpability or blame.

112.)  The trial court thus utterly failed in its constitutionally imposed duty to "guide and focus the jury's consideration of mitigating circumstances."  <u>Peek v. Kemp</u>, 784 F.2d 1479, 1494 (11th Cir. 1986).  While explicit definition of mitigating

---

[21]     No similar materials were given the jurors regarding mitigating

circumstances and their function is not required in every case, what is required is that "it be clear from the jury instructions considered in context that a reasonable jury could not have misunderstood the meaning and function of mitigating circumstances." Id. In Petitioner's case, there is a reasonable possibility that the meaning and function of mitigating circumstances were lost on a jury who was instructed that mitigation went to moral culpability or blame, but who were not told that mitigation was relevant in the consideration of punishment. The outcome of Petitioner's sentencing hearing was clearly and actually prejudiced by the improper and inadequate instructions.

113.) The jurors were also given absolute unbridled discretion to impose life or death for any reason or no reason at all, upon the finding of one statutory aggravating circumstance. This unbridled discretion is prohibited by the Eighth and Fourteenth Amendments, and produced unreliable results in this case. This error was compounded by the fact that the jurors were given vague instructions on the statutory aggravators they were to consider, in violation of the Eighth and Fourteenth Amendments.

114.) In Petitioner's case, the jury was instructed on several aggravators, including that "the offense of murder was outrageously or wantonly vile, horrible, or

circumstances.

inhumane." The jury was clearly confused by the unconstitutionally vague and overbroad language, as they requested clarification on "depravity of mind." (T. Vol. 6 at 1468). The court only reread the standard charge, which did nothing to elucidate the aggravator to the jury. (T. Vol. 6 at 1469).

### C. Unanimity

115.) In its charge to the jury at sentencing, the trial court stated, that "your verdict as to penalty must be unanimous." (T. Vol. 6 at 1450). During deliberations, the jury could not reach a unanimous decision and asked the judge what sentence Petitioner would receive if the jury was not unanimous. The jury was instructed that the verdict had to be unanimous. (T. Vol. 6 at 1478). The trial court's instructions regarding unanimity of the sentence were an incorrect statement of the law. Under Georgia law, a murder prosecution where the jury may impose only life imprisonment or death, "if the convicting jury is unable to agree on which of those two sentences to impose, the trial judge must impose the lesser, life imprisonment." Miller v. State, 237 Ga. 557, 559, 229 S.E. 2d 376, 377 (1976). See also, Hill v. State, 250 Ga. 821, 301 S.E. 2d 269 (1983). Thus, if just one juror believes that a death sentence is inappropriate, the jury cannot recommend the death penalty and the trial court must impose a sentence of life imprisonment. O.C.G.A. § 17-10-31.1(c).

116.) The effect of instructing the jury that its sentencing verdict had to be

unanimous was to pressure holdout jurors, who might otherwise have been predisposed to sentence the defendant to life imprisonment, to vote for a sentence of death in an effort to achieve unanimity. Therefore, by effectively instructing the jury that a life verdict required unanimity and failing adequately to enlighten the jurors of the consequences of non-unanimity, the trial court denied Petitioner his constitutional rights.

117.) These erroneous and improper instructions violated Petitioner's rights the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[22] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[22] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM ELEVEN

### THE TRIAL COURT ERRONEOUSLY DENIED PETITIONER'S CHALLENGE TO THE JURY ARRAYS IN VIOLATION OF HIS RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

118.) This Claim is evidenced by the following:

119.) All other claims and allegations in this Petition are incorporated herein by specific reference.

120.) Trial counsel for Petitioner filed a Motion to Quash the Indictment and Challenge to the Composition of the Grand and Petit Juries on May 8, 1998 and subsequently submitted challenges to the array, alleging that the arrays were illegally composed and violative of his rights as a capital defendant. The trial court committed prejudicial and reversible error when it denied Petitioner's challenge to the composition of the grand and traverse jury arrays.

121.) The Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution guarantee a capital defendant the right to a fairly constituted jury array, as well as a trial before a jury that represents a fair cross section of the community. Hicks v. Oklahoma, 447 U.S. 343 (1980); Wood v. Georgia, 370 U.S. 375, 390 (1962); Costello v. U.S., 350 U.S. 359, 363 (1956); West v. State, 313 S.E.2d 67 (Ga. 1984). In Petitioner's Amended Motion for New Trial, he argued

71

that the Glynn County jury array was impermissibly composed so that deceased and convicted felons were included in the jury pools from which Petitioner's traverse jury was drawn. Such a tainted list is constitutionally impermissible. As a result, the challenges should have been sustained and Petitioner's conviction reversed.

122.) The Sixth Amendment guarantees a criminal defendant the right to a trial by an impartial jury of citizens of the community. Impartiality is interpreted as neutrality of each individual juror, in the sense of the juror having no specific determinable viewpoint, as well as neutrality of the whole, balancing the differing viewpoints of individual jurors. Impartiality has evolved into include the concept that an impartial jury is one that adequately represents a "fair cross-section of the community." Taylor v. Louisiana, 419 U.S. 522 (1975); Duren v. Missouri, 439 U.S. 35 (1979).

123.) In Georgia, the jury list must include a fair cross-section of the eligible members of the community. Lipham v. State, 364 S.E.2d 840 (Ga. 1988). Further, jury commissioners have a duty not to pursue a course of conduct which results in racial discrimination. Bonararte v. Smith, 362 F. Supp. 1315 (S.D. Ga. 1973). The making of the jury list for Petitioner's trial in Glynn County did not meet the Georgia requirement of including a fair cross-section of the eligible members of the community.

72

124.) A list that is a "fairly representative cross-section of the community is both a constitutional standard as well as a duty injury selection procedures in Georgia." <u>Pullum v. Georgia</u>, 396 F.2d 251,254 (5th Cir. 1968). In Petitioner's trial, the over-representation of felons and deceased persons violated the rights of persons who were eligible for jury duty but were left off the list. This action further violated Petitioner's right to have a jury box that represented a fair cross-section of the community. The people left off the list could have ended up on Petitioner's jury, and their presence could have affected the outcome of the trial.

125.) The errors in the jury array, which deprived him of a fair jury, violated Petitioner's rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[23] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[23] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM TWELVE

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY IMPROPERLY EXCUSING MULTIPLE PROSPECTIVE JURORS FOR CAUSE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

126.) This Claim is evidenced by the following:

127.) All other claims and allegations in this Petition are incorporated herein by specific reference.

128.) The trial court denied Petitioner's rights to a fair and impartial jury, due process, equal protection, a fair trial, and a reliable determination of the punishment, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by improperly excusing numerous prospective jurors for cause. Under the United States Constitution, jurors cannot be excused for cause, simply because they voice general objections to the death penalty or express conscientious or religious scruples against its infliction unless their views will prevent or substantially impair their ability to be jurors in accordance with theft oath and the law.

129.) The trial court committed reversible error by disqualifying prospective jurors on the basis of <u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968), and <u>Wainwright v. Witt</u>, 469 U.S. 412(1985), without adequate inquiry into whether the jurors' views

about capital punishment would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oaths. <u>Witt</u>, 469 U.S. at 420; <u>Adams v. Texas</u>, 448 U.S. 38 (1980); <u>Jarrell v. State</u>, 261 Ga. 880,413 S.E.2d 710 (Ga. 1992) (holding that a trial court commits reversible error by excusing a prospective juror who merely expresses qualms about the death penalty). In the absence of showing that the juror's reservations would "prevent or substantially impair" that person's performance as a juror, excusing such a juror requires reversal of the death sentence. <u>Id.</u>

130.) The trial court improperly excused, among others, prospective jurors Baisden, Sallas, Scott, Mack, Mathis, Tinkham, and Powell. (V. 239-52, 410-20, 825-35, 1380-88, 1752-69, 1342-54). Although these prospective jurors voiced some objections and concerns on capital punishment, their overall responses demonstrated that their views would not substantially impair their ability to be fair and impartial jurors in this case. The trial court committed reversible error by excusing these prospective jurors for cause for simply voicing general concerns about capital punishment when they were not substantially impaired from being jurors. Therefore, Petitioner should receive a new trial.

131.) The improper exclusion of prospective jurors for cause violated Petitioner's rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments

to the United States Constitution.[24] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

### CLAIM THIRTEEN

**THE TRIAL COURT ERRONEOUSLY RESTRICTED THE DEFENSE'S VOID DIRE OF PROSPECTIVE JURORS IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

132.) This Claim is evidenced by the following:

133.) All other claims and allegations in this Petition are incorporated herein by specific reference.

134.) The trial court denied Petitioner his rights to a fair and impartial jury, due process, equal protection, a fair trial, and a reliable determination of punishment, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by preventing Petitioner from conducting a full and adequate you dire of prospective jurors.

135.) The Sixth and Fourteenth Amendments to the United States

---

[24] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

Constitution guarantee defendants the right to a fair and impartial jury. Under

O.C.G.A. § 15-12-133, a defendant has the right to examine prospective jurors on

"any fact or circumstance indicating any inclination, leaning, or bias which the juror

might have respecting the subject matter of the action" in order to obtain a fair and

impartial jury. In addition, O.C.G.A. § 17-10-31.1 requires jurors in capital cases to

consider fairly all three sentencing options – life with parole, life without parole, and

the death penalty – before determining the appropriate sentence. Petitioner had a

constitutional and statutory right to examine prospective jurors on any facts or

circumstances concerning issues of both guilt/innocence and sentence.

136.) Reverse-Witherspoon jurors, those who are predisposed toward

imposing a sentence of death upon finding a defendant guilty of murder, must be

excluded for the same reason that jurors who are opposed to capital punishment and

could not vote for a death sentence must be excluded. Morgan v. Illinois, 504 U.S.

719 (1992); Skipper v. State, 364 S.E.2d 835 (Ga. 1988). A juror must be excused

whenever his or her views on capital punishment "would prevent or substantially

impair the performance of his duties as a juror in accordance with his instructions

and his oath." Adams v. Texas, 448 U.S. 38, 44(1980); Witherspoon v. Illinois, 391

U.S. 510 (1968). Thus, "an inability fairly to consider a life sentence is just as

disqualifying as an inability fairly to consider a death sentence." <u>Childs v. State</u>, 357 S.E.2d 48, 56 (Ga. 1987).

137.) The trial court denied Petitioner his right to a fair sentencing determination by curtailing defense counsel's voir dire on whether jurors would automatically vote for death and by the court's use of an erroneous standard in its own reverse-Witherspoon questioning. By conducting a wholly inadequate reverse-<u>Witherspoon</u> voir dire itself, and then refusing to allow defense counsel to ask pertinent questions, the trial court denied Petitioner's constitutional right to a jury free of death advocates. <u>Id.</u>

138.) The trial court repeatedly blocked defense counsel from learning about the jurors' feelings about the death penalty on voir dire. The trial court refused to allow defense counsel to ask meaningful reverse-<u>Witherspoon</u> questions. Instead, the court maintained that its own questions and rehabilitation efforts, as well as a few cursory questions asked by the defense, were sufficient and any further questioning was merely redundant or objectionable. This occurred in regards to prospective jurors Elbaum, Burdette, Wise, Ross, and Bryant, among others. (T. 716-17, 777-95, 906-19, 1147-82, 1699-1711).

139.) Petitioner's inquiries into the biases and prejudices of these prospective jurors were proper, relevant, and necessary in order to determine whether they could

be fair and impartial on either the question of guilt-innocence or sentence. The trial court's improper limitation on defense's voir dire questioning of prospective jurors deprived Petitioner of the opportunity to adequately determine disqualifying biases and prejudices of prospective jurors. Consequently, Petitioner was not able to intelligently challenge or object to challenges of prospective jurors for cause or intelligently exercise his peremptory strikes.

140.) The errors herein deprived Petitioner of rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[25] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[25] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM FOURTEEN

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ALLOWING PROSECUTION WITNESS, DON MATECUN, TO TESTIFY, THEREBY VIOLATING PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

141.)  This Claim is evidenced by the following:

142.)  All other claims and allegations in this Petition are incorporated herein by specific reference.

143.)  The trial court committed prejudicial error in failing to grant defense counsel's objection and motion for mistrial due to the inflammatory and prejudicial effect of State's witness Don Matecun's overly emotional testimony. "Demonstrations and outbursts which occur during the course of a trial are matters within the trial court's discretion unless a new trial is necessary to insure a fair trial." Dick v. State, 273 S.E.2d 124,133 (Ga. 1980).

144.)  The State called Don Matecun, a close friend of the victim's and a fellow sheriff's deputy.  Matecun testified that he saw the flashing lights of Dinkheller's vehicle, approached the scene, and saw Dinkheller on the ground.  (T. 93-95).  The State then had Matecun identifiy State's Exhibit 4, a photograph of the scene previously identified by another witness and previously admitted into evidence.  (T. 75).  Matecun displayed excessive emotions upon seeing Exhibit 4.

80

He broke down crying on the stand and was dismissed without providing any substantive evidence. (T. 95). Defense counsel objected to the prejudicial display of emotions and moved for a mistrial. (T. 97). The trial court overruled the objection and denied the motion for mistrial. (T. 99).

145.) The trial court erred in allowing the testimony of Matecun and failing to grant a mistrial when the witness broke down on the stand. The State claimed Matecun's testimony was relevant and his emotional outburst was unexpected, and the trial judge agreed. However, Matecun offered no substantive evidence, and his testimony was neither relevant nor necessary. Even the emotional instigator was unnecessary, as the State showed Matecun a previously identified and admitted photograph, which triggered Matecun's emotional outburst. There was no purpose in showing Matecun Exhibit 4. Furthermore, Matecun's overly emotional response was expected. "[S]uch emotions are reasonably expected by one who is a close relative of a murder victim." Dick v. State, 273 S.E.2d 124, 133 (Ga. 1980).

146.) The purpose of Matecun's testimony was to display an emotional response to the jury. The effect of a law enforcement officer breaking down on the stand is prejudicial. The court abused its discretion by not granting Petitioner's motion for mistrial.

147.) By allowing the unnecessary and inflammatory display of emotion by

Don Matecun, the trial court denied Petitioner his rights pursuant to the Fifth, Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution.[26]  As the

failure of the state court to grant relief on this claim is contrary to or an unreasonable

application of Supreme Court authority or is based upon an unreasonable

determination of the underlying facts in light of the evidence presented, habeas relief

should follow.

### CLAIM FIFTEEN

**THE TRIAL COURT ERRONEOUSLY ADMITTED GRUESOME
AND REDUNDANT CRIME SCENE PHOTOGRAPHS INTO
EVIDENCE IN VIOLATION OF PETITIONER'S RIGHTS
UNDER THE DUE PROCESS CLAUSE AND THE FIFTH,
SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO
THE UNITED STATES CONSTITUTION.**

148.)  This Claim is evidenced by the following:

149.)  All other claims and allegations in this Petition are incorporated herein

by specific reference.

150.)  The trial court admitted inflammatory, prejudicial, and cumulative

photographs of the victim in violation of the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution.  The photographs had limited

relevancy and materiality, were cumulative, and their prejudicial impact outweighed

---

[26]     To the extent trial counsel failed to raise and litigate this issue at trial or on
appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

any probative value.  The photographs were admitted at trial over defense objection.
(T. 127-136).

151.)  It is unconstitutional for a death sentence to be imposed under the
influence of passion, prejudice, or any other arbitrary or irrelevant factors.
Photographs or exhibits that are not material or relevant and that tend to be
inflammatory and prejudicial are thus inadmissible.  The State in this case
introduced and referred to numerous photographs of the victim's body and the
gunshot wounds.  (State's Exhibits 3-5,10-11, 16-17, 19-20, 22-23, 25,30,35-36,38-
39,44-45,48,50-52, 69;  T. 1544-48, 1556-59, 1568-71, 1573-1588, 1602-03).

152.)  The wrongful admission of such evidence in this case violated the
Eighth Amendment's prohibition against cruel and unusual punishment.  "The
fundamental respect for humanity underlying the Eighth Amendment's prohibition
against cruel and unusual punishment gives rise to a special 'need for reliability in
the determination that death is the appropriate punishment' in any capital case."
Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (citation omitted).

153.)  Despite the fact that there was no material question regarding how the
victim was killed or by whom, the State introduced twenty-four photographs
highlighting the victim's wounds.  Especially considering the videotape of the

incident and Petitioner's interviews with GBI, these photographs were not probative. The photographs were gruesome and inflammatory; they did not serve the State's proffered purpose but rather served the purpose of prejudicing the jury against Petitioner.  Furthermore, the photographs were cumulative.  The trial court erred in admitting the gruesome and inflammatory photos.  <u>Brown v. State</u>, 302 S.E.2d 347 (Ga. 1983) (reversing two murder conviction where other, less revolting photo could have illustrated the powder bums the state wished to illustrate); <u>Ramey v. State</u>, 298 S.E.2d 503 (Ga. 1983).

154.)  The trial court committed reversible error by failing to suppress the photographs and exhibits of the victim and of the crime scene, because they were irrelevant, inflammatory, prejudicial, and of no value to the jury.[27] Petitioner was consequently denied his rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

## CLAIM SIXTEEN

---

[27]     To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

**THE TRIAL COURT ERRONEOUSLY PERMITTED THE STATE TO DISPLAY, AND THEN ADMITTED INTO EVIDENCE, THE CLOTHING OF THE VICTIM AND THEN EXACERBATED THE ERROR BY DENYING THE DEFENSE'S MOTION FOR MISTRIAL AFTER AN EMOTIONAL OUTBURST BY THE VICTIM'S MOTHER IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

155.) This Claim is evidenced by the following:

156.) All other claims and allegations in this Petition are incorporated herein by specific reference.

157.) The trial court committed prejudicial error by allowing the State to admit into evidence the bloody clothing of the deceased. The clothing was highly inflammatory, cumulative of the many photographs showing the same thing, and simply not probative. By admitting the clothing, the trial court denied Petitioner his rights pursuant to the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[28] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[28] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM SEVENTEEN

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY COMMENTING, BEFORE THE JURY, ON THE LIMITED VIEWING OF THE VIDEOTAPE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

158.)  This Claim is evidenced by the following:

159.)  All other claims and allegations in this Petition are incorporated herein by specific reference.

160.)  The trial court committed prejudicial error when the court commented in front of the jury that the video tape of the incident was to be "stopped if it doesn't do so automatically."  (T. 523).  Defense counsel objected and moved for a mistrial which the court overruled.  The curative instruction given by the court was more harmful than helpful by drawing the jury's attention to the end of the tape.  By overruling the objection and motion for new trial, the trial court denied Petitioner his rights to a fair and impartial jury, due process, equal protection, a fair trial, and a reliable determination of punishment.

161.)  In this case where there was a videotape of the incident leading to the charge of murder, the court committed prejudicial error by remarking on part of the

86

tape the jury would not see. The trial court should have anticipated the need to refrain from such comments, not only because it would have been proper to refrain but because the court had previously ruled to restrict the jury's viewing to the incident itself. The reasonable and probable inference is that the remark prejudiced the jury, and this prejudice was accentuated by the court's curative instruction, which only drew more attention to the inadmissible parts of the tape. It can be presumed that the jurors were left questioning why only part of the tape was shown and wondering what the remainder contained. Moreover, the prejudice would go against Petitioner as defense counsel was forced to object. The trial court erred in not granting Petitioner a new trial and deprived him of his rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[29] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[29]     To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM EIGHTEEN

**THE TRIAL COURT ERRONEOUSLY PERMITTED THE STATE TO PLAY THE VIDEOTAPE DURING ITS CLOSING ARGUMENT OF THE GUILT/INNOCENCE PHASE OF THE TRIAL IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

162.) This Claim is evidenced by the following:

163.) All other claims and allegations in this Petition are incorporated herein by specific reference.

164.) The trial court committed prejudicial error when it overruled defendant's objection to the showing of the incident videotape to the jury during the state's closing argument. (V. 4 at 967). The videotape is highly emotionally charged and gruesome. Furthermore, the jury had already watched the videotape, and it was submitted into evidence. The trial court denied Petitioner's rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by allowing the state to replay the video of the crime during the sentencing phase of the trial.[30] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence

presented, habeas relief should follow.

## CLAIM NINETEEN

**THE TRIAL COURT ERRONEOUSLY ALLOWED THE STATE TO PROVIDE PETITIONER WITH INADEQUATE, UNTIMELY NOTICE OF CERTAIN AGGRAVATING CIRCUMSTANCE AND THEN REFUSED TO REMEDY THE INADEQUATE NOTICE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

165.) This Claim is evidenced by the following:

166.) All other claims and allegations in this Petition are incorporated herein by specific reference.

167.) The trial court denied Petitioner his rights to a fair and impartial jury, due process, equal protection, a fair trial, and a reliable determination of punishment, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to grant Petitioner's reasonable request for a continuance, which was needed in order to prepare for trial regarding the State's late additions to its witness list. See generally O.C.G.A. § 17-16-6, 17-8-22.

168.) In the present case, injustice occurred when the trial court denied Petitioner's request for continuance due to the State's short notice regarding

---

[30] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

additions to the its witness list. (T. 12). In order to prepare for the new witnesses the State planned to call, the trial court should have granted the defense an adequate and reasonable continuance. The State's late witness list included Baldwin County Jail employees, whose testimony was offered in aggravation. Considering the grave and profound importance of preparation for a death penalty trial, the trial court abused its discretion in failing to grant the continuance.

169.) Petitioner was severely and unnecessarily prejudiced by this violation of his due process rights and his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[31] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[31] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM TWENTY

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ALLOWING THE STATE TO PRESENT IMPROPER VICTIM IMPACT EVIDENCE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

170.)  This Claim is evidenced by the following:

171.)  All other claims and allegations in this Petition are incorporated herein by specific reference.

172.)  The scope of admissible victim impact evidence has yet to be settled. However, with Payne v. Tennessee, 501 U.S. 808 (1991), the amending by the Georgia Legislature of O.C.G.A. Section 17-10-1.2, and Livingston v. State, 444 S.E.2d 748 (Ga. 1994), the criminal justice system lives with the legal fiction that victim impact testimony serves a dispassionate objective and is not designed to appeal to passion or to prejudice the jurors emotionally.  Testimony by a murdered individual's friends and loved ones about the life of the victim, about the victim's relationships with family and friends, about the emotional losses resulting from the victim's untimely demise, about fatherless sons and daughters, about widows and grieving parents, supposedly reflects upon the culpability of the defendant on trial.

173.)  Such evidence is presented for the purpose of considering whose life is the worthier and for the purpose of inviting the jurors to make sentencing decisions

91

based on emotion, class, race, and other arbitrary distinctions.  Victim impact evidence has any relevance in any way to the true issue of the murder defendant's personal blameworthiness for the taking of another's life.  Livingston, 264 Ga. at 757 (Benham, J., dissenting).

174.)  In this case, on top of other unduly prejudicial victim impact evidence, the trial court erred by allowing the victim impact statement by witness Angela Dinkheller to contain remarks from the perspective of the deceased.  (T. 1167-69).  The trial court acknowledged that allowing statements from the deceased's point of view would be prejudicial and lead to the arbitrary imposition of the death penalty.  (T. 1165-66).  The court erred, however, in not striking all of the statements from the deceased's point of view from Ms. Dinkheller's statement.  Having the victim's wife read to the jury about how her husband felt and what he thought was highly prejudicial and inflammatory.  (T. 1278-82).

175.)  This Court should set aside the death sentence imposed in this case, as it was based upon emotional reactions of the jurors after hearing the victim's family members testimony, rather than upon a dispassionate analysis of Petitioner's personal blameworthiness for the offense.  The verdict violates Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution.[32]  As the failure of the state court to grant relief on this claim is

contrary to or an unreasonable application of Supreme Court authority or is based

upon an unreasonable determination of the underlying facts in light of the evidence

presented, habeas relief should follow.

### CLAIM TWENTY-ONE

**THE TRIAL COURT ERRONEOUSLY PERMITTED THE
STATE TO PROCEED WITH ALL OF THE POSSIBLE
AGGRAVATING CIRCUMSTANCES NOTWITHSTANDING
THE INSUFFICIENT EVIDENCE TO SUPPORT SUCH
AGGRAVATORS IN VIOLATION OF PETITIONER'S RIGHTS
UNDER THE DUE PROCESS CLAUSE AND THE FIFTH,
SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO
THE UNITED STATES CONSTITUTION.**

176.)  This Claim is evidenced by the following:

177.)  All other claims and allegations in this Petition are incorporated herein

by specific reference.

178.)  The trial court committed prejudicial error when it allowed the State to

seek the possible aggravating circumstance that the killing was outrageously or

wantonly vile, horrible or inhuman in that it involved depravity of mind or torture to

the victim prior to the death of the victim, even though there was not sufficient

evidence to support the aggravator.  (T. 1158, 1129); O.C.G.A. § 17-10-30(b)(7).

---

[32]     To the extent trial counsel failed to raise and litigate this issue at trial or on
appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

179.)  An aggravating factor may not be presented to the jury if the evidence presented at trial was insufficient to authorize the jury to find its existence beyond a reasonable doubt.  <u>Butts v. State</u>, 546 S.E.2d 472, 478 (Ga. 2001) (citing <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979)).

180.)  The shootout between Petitioner and Deputy Dinkheller lasted a short time, and their entire interaction lasted less than five minutes.  The State did not prove premeditation and offered questionable evidence on intent.  Petitioner did not torture the deputy.  The physical harm that occurred came solely from the gunfire exchange between the two men.

181.)  Even viewed in a light most favorable to the court's ruling, the State did not offer sufficient evidence to authorize the jury to find beyond a reasonable doubt that the killing was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind or torture to the victim prior to the death of the victim. The trial court erred in allowing the State to argue for and seek the aggravating factor and consequently violated Petitioner's rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[33]  As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable

94

determination of the underlying facts in light of the evidence presented, habeas relief should follow.

### CLAIM TWENTY-TWO

**THE TRIAL COURT ERRONEOUSLY ALLOWED THE STATE TO PRESENT INFLAMMATORY TESTIMONY BY RICKY HORNE DESPITE THE IMPROPER NOTICE OF THE TESTIMONY IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

182.) This Claim is evidenced by the following:

183.) All other claims and allegations in this Petition are incorporated herein by specific reference.

184.) The trial court committed prejudicial error by denying Petitioner's motion for mistrial regarding the testimony of the state witness Ricky Horne. The State had not given proper notice to defense counsel that future dangerousness of the defendant was going to be a matter of aggravation. (T. 1274). The testimony provided by Mr. Horne inflamed the jury and a mistrial should have been granted. (T. 1272-1276).

185.) The State may not offer evidence which would result in the imposition of the death penalty die to passion, prejudice, or arbitrary factors, as to do so would

---

[33]      To the extent trial counsel failed to raise and litigate this issue at trial or on

95

violate the constitutional guarantees to due process of law.

186.) Petitioner's trial counsel moved for a mistrial due to the improper, inflammatory, and prejudicial display by the state in presenting Mr. Horne as a sentencing witness. The trial court erred in not declaring a mistrial and gave an inadequate curative instruction. (T. 1277). This error violated Petitioner's rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[34] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

appeal, counsel was ineffective, and Petitioner was prejudiced thereby.
[34] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM TWENTY-THREE

### SECTION 16-5-1, O.C.G.A., FAILS TO ADEQUATELY DEFINE MURDER, AND THUS PETITIONER'S TRIAL FOR THE OFFENSE OCCURRED IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

187.)  This Claim is evidenced by the following:

188.)  All other claims and allegations in this Petition are incorporated herein by specific reference.

189.)  The trial court denied Petitioner his rights to a fair and impartial jury, due process, equal protection, a fair trial, and a reliable determination of the punishment, pursuant to the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution by applying the unconstitutional statute of O.C.G.A. § 16-5-1, which fails to adequately define murder.

190.)  Under the Due Process Clause of the Fourteenth Amendment, a criminal statute must define a criminal offense in a language so that ordinary persons will understand what conduct is proscribed, or it must provide ascertainable standards of guilt to protect against arbitrary enforcement.  In addition, the criminal statute must provide a construction that, on its face, can reasonably can expected to be applied in a consistent and meaningful way so as to provide adequate guidance.

97

Steele v. State, 400 S.E.2d 1, 2 (Ga. 1991) (citing King v. State, 271 S.E.2d 630 (1980)).

191.)  O.C.G.A. § 16-5-1 is unconstitutional on its face, because it fails to adequately define the offense of "murder" to meet the requirements of the Due Process and Equal Protection Clauses of the United States Constitution.  The statute provides that the offense of murder requires "malice aforethought" but then fails to sufficiently define "malice aforethought."  The statute's attempted definition malice and instruction of when malice is implied are both constitutionally deficient to protect against arbitrary enforcement.  A person of ordinary intelligence would not understand this definition of murder provided by § 16-5-1.  Furthermore, the statute provides no guidelines or standards to enable a trier of fact to ascertain when and under what circumstances murder has occurred.

192.)  The trial court committed reversible error by subjecting Petitioner to this unconstitutionally vague and ambiguous statute in violation of his rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[35] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence

98

presented, habeas relief should follow.

## CLAIM TWENTY-FOUR

**THE PROCESS OF DEATH-QUALIFYING JURORS, WHICH WAS EMPLOYED AT PETITIONER'S TRIAL, IS UNCONSTITUTIONAL AND VIOLATED PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

193.) This Claim is evidenced by the following:

194.) All other claims and allegations in this Petition are incorporated herein by specific reference.

195.) Excluding jurors who do not meet the "death-qualification" requirement is unconstitutional. This process of qualification resulted in a biased and prosecution-prone jury and deprived Petitioner of his right to a fair and impartial jury drawn from a fair cross-section of the community. The trial court denied Petitioner his rights to a fair and impartial jury, due process, equal protection, a fair trial, and a reliable determination of punishment by death-qualifying prospective jurors.

196.) In death penalty cases, all jurors must be "death-qualified," a process by which those unable to impose a death sentence are excluded. Witherspoon v.

---

[35]    To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

Illinois, 391 U.S. 510(1968) ("[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause, simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.").

197.)  The death-qualification process sets the tone of the bifurcated trial as one focused on a death sentence.  The jurors who must first decide the issue of guilt or innocence of the defendant are immediately and repeatedly asked whether they would be able to inflict a particular punishment – death.  Before the court ever makes a determination of the jurors' qualifications as to the first three statutory questions, the jurors are subject to questions concerning their opinion about the efficacy of the different choices of punishment.  The defendant's presumption of innocence is inapplicable at that point.  The jurors are, in effect, being told that the system considers the defendant guilty, because the "system" requires that the jurors be qualified as to punishment before they have been qualified as to their opinions, feelings, and beliefs concerning the defendant's innocence.  Those jurors who are "death-qualified" are prone to convict a defendant.

198.)  Logic and common sense dictate that the jurors' attention is focused on what the punishment should be before ever hearing my evidence about the guilt or innocence of the defendant. The focusing of the jurors' attention on punishment

100

before they have been asked to determine whether the defendant is even guilty of the offense for which he has been charged means that he is denied his right to a fair trial by a panel of impartial, indifferent jurors. A failure to afford a criminal defendant this right "violates even the minimal standards of due process." Morgan v. Illinois, 504 U.S. at 727 (1992).

199.) The death-qualification process prevented Petitioner from receiving a fair trial by a panel of impartial and indifferent jurors and violated his rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[36] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[36] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM TWENTY-FIVE

### THE TRIAL COURT IMPROPERLY DENIED PETITIONER'S PRE-TRIAL MOTIONS IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

200.)  This Claim is evidenced by the following:

201.)  All other claims and allegations in this Petition are incorporated herein by specific reference.

### A.   Motion to Exclude the Death Penalty on Account of the Arbitrary Use of Prosecutorial Discretion in the Plea Bargaining Process.

202.)  The use of prosecutorial discretion in plea bargaining decisions in capital prosecutions is arbitrary and capricious, in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The trial court erred in denying Petitioner's motion to preclude the State from seeking the death penalty due to the unconstitutionality of prosecutorial discretion regarding plea negotiation and the determination of when to seek a death sentence.

203.)  The United States Supreme Court has emphasized that "[d]eath, in its finality," is a unique penalty – meaningfully different from all other forms of punishment.  Woodson v. North Carolina, 428 U.S. 280, 305 (1976) ("Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific

102

case."); <u>Gardner v. Florida</u>, 430 U.S. 349, 357-58(1977); <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978); <u>Beck v. Alabama</u>, 447 U.S. 625, 637-38 (1980); <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). Absent a rational distinction between this case and those where the death penalty has not been actively pursued, the imposition of the death penalty on Petitioner constitutes cruel and unusual punishment and punishment without due process of law, violating the United States Constitution.

204.) Unguided and unlimited prosecutorial discretion in determining with whom the State will plea bargain and against whom the State will seek the death penalty is unconstitutional. The Georgia Legislature has authorized the state's elected district attorneys to seek the death penalty for qualifying acts described by state law, such as the intentional killing of a police officer. O.C.G.A. §17-10-30. (b)(8). This discretion at the start of the trial process is parallel to the unconstitutional discretion of the juries in pre-<u>Furman</u> capital cases.

205.) The Supreme Court in <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), held that the imposition and infliction of the death penalty under arbitrarily and randomly administered systems in which juries are given unrestricted and unguided discretion to impose a sentence of death constitutes unconstitutionally cruel and unusual punishment. The current discretion to seek the death penalty in Georgia is

103

practically similar in that it is in effect unrestricted and unguided, as the past jury

sentencing discretion was. A prosecutor is theoretically limited in discretion in two

ways: by the requirement of at least one statutory aggravating factor and by the

jury's ultimate decision to impose the sentence. Neither of these restrictions are

effective in guarding against the arbitrary and unconstitutional application of

Georgia's death penalty.

206.) Due to the catch-all statutory aggravating factor, as a practical matter,

all murders in the state of Georgia are death penalty eligible. The death penalty may

be imposed if the following statutory aggravating circumstance is supported by the

evidence: "The offense of murder, rape, armed robbery, or kidnapping was

outrageously or wantonly vile, horrible, or inhuman in that it involved torture,

depravity of mind, or an aggravated battery to the victim." O.C.G.A. § 17-10-

30(b)(7). This language is unconstitutionally ambiguous, as it allows the prosecutor

fill discretion in charging any murder as a capital crime.

207.) Because Georgia prosecutors have unbridled discretion to seek the

ultimate punishment against defendants accused of murder, theoretical limitations on

the imposition of the death penalty are irrelevant. If only a certain arbitrary pool of

defendants are charged with capital crimes, the resulting imposition, no matter how

well guided by statute, will remain arbitrary and capricious. Furman, 408 U.S. at

257 (Douglas, J., concurring).

208.) The State refused to offer Petitioner the opportunity to plead guilty in return for a sentence less than death. (R. 86). At the time of Petitioner's trial, the District Attorney of the Dublin Judicial Circuit had only sought the death penalty on one other occasion, and that case was eventually disposed of by a plea bargain involving a life sentence. (R. 87). In light of that case, it is entirely arbitrary that the District Attorney refused to accept a settlement whereby Petitioner would plead guilty in exchange for a sentence of life without parole.

209.) Furthermore, the State does not seek the death penalty every time defendant is charged with murder of a law enforcement officer. See generally Gore v. State, 246 Ga. 575, 272 S.E.2d 306 (1980).

210.) Just as the effect of unbridled sentencing discretion in the jury led to death penalty reform in the 1970s, the unbridled charging discretion in the prosecutors must lead to death penalty reform today. The unbridled discretion to seek the death penalty for any defendant charged with murder leads to the arbitrary and capricious application of the death penalty. Prosecutorial discretion in plea bargaining and charging violates the Eighth and Fourteenth Amendments of the United States and is unconstitutional. Thus, the trial court should have granted Petitioner's motion to preclude the death penalty as a possible punishment. This

Court must reverse Petitioner's sentence of death.

**B.** **Motion to Dismiss on the Merits Because of Prosecutorial Misconduct or in the Alternative Motion *in Limine* and Motion to Exclude Certain Evidence.**

211.) The State's failure to maintain key evidence constituted prosecutorial misconduct. The State lost Petitioner's vehicle, seized upon arrest, after inspecting and evaluating it but before the defense could inspect and evaluate it. This mishandling of essential evidence violated Georgia law enforcement's standards, policies, and procedures and the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The trial court committed prejudicial error in denying Petitioner's Motion to Dismiss or in the Alternative Motion to Exclude the Evidence. (R. 387-392, 670-678).

212.) "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). If a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence constitutes a denial of due process of law. Arizona v. Youngblood, 488 U.S. 51, 58 (1988). The Supreme Court has repeatedly emphasized that because of the exceptional and irrevocable nature of the death penalty, "extraordinary measures"

106

are required by the Eighth Amendment to ensure the reliability of decisions regarding both guilt and punishment. Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). The misconduct of the officers substantially affected the reliability of the decision making process in this ease.

213.) On May 8, 1998, Petitioner's trial counsel filed a Motion to Preserve, Inspect, Examine, and Independently Test All Physical Evidence and Notice to Produce. (R. 186-189). The purpose of this motion was to prepare for trial by evaluating the prosecution's physical evidence, specifically including Petitioner's truck. (R. 188). Investigating law enforcement officers seized Petitioner's truck at the time of his arrest in January of 1998. (R. 186). While in the custody of law enforcement, Petitioner's truck was searched, inspected, photographed, measured, and tested. Based upon these actions, law enforcement officers developed data, gathered information, and formulated theories of the prosecution. (H. 1/14/99, 30-32). In November of 1998, defense counsel requested that the prosecution arrange for an examination of Petitioner's truck but were informed thereafter that an employee of the storage lot had released Petitioner's truck and its whereabouts were unknown. (R. 186-87); (H. 1/14/99, 34-36, 43-45).

214.) Petitioner's ability to inspect, test, and measure the vehicle was essential to his defense by enabling him to prove the sequence, angles, and number

of shots fired between the officer and Petitioner according to the GBI Crime Lab firearms examiner. (H. 4/21/99, 8, 1 1-12).

215.) The trial court found that the truck and any potential tests on the truck were not exculpatory evidence and there was no bad faith on the part of the prosecution. These findings are clearly erroneous. The truck was studied and used by the State as evidence against Petitioner. An independent evaluation of the truck could have assisted in his defense. Additionally, defense counsel made the State aware of its need to inspect the truck in May, 1998, and again in November, 1998. The State was fully aware of the evidentiary nature and value of the truck.

216.) The failure of the State to secure and maintain evidence in this case constitutes prosecutorial misconduct under <u>Brady</u>/<u>Youngblood</u>. The conduct of the law enforcement officers violated standards, policies, and procedures for the handling of evidence, Petitioner's rights pursuant to O.C.G.A § 17-16-1 a seq., and the November 24, 1998, order of the trial court ordering discovery. (R. 348-49).

217.) The errors herein deprived Petitioner of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[37] As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an

unreasonable determination of the underlying facts in light of the evidence

presented, habeas relief should follow.

## CLAIM TWENTY-SIX

**THE TRIAL COURT ERRONEOUSLY ADMITTED THE TESTIMONY OF THE COURT-APPOINTED PSYCHIATRIST DESPITE THAT HIS ACTIONS AND PROFESSED UNDERSTANDING OF HIS ROLE DEMONSTRATED A CLEAR PARTIALITY TOWARDS THE STATE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

218.) This Claim is evidenced by the following:

219.) All other claims and allegations in this Petition are incorporated herein

by specific reference.

220.) Petitioner entered a plea of not guilty by reason of insanity to the

indictment and filed a Notice of Intent of Defense to Raise Issue of Insanity or

Mental Incompetence thus framing the issue to be tried. (R. ID-4, 249-249B). His

mental status at the time of the events was the focus of the defense in the guilt-

innocence phase of the trial. (T. 22-44).

221.) Pursuant to the provisions of O.C.G.A. §17-7-130.1, prior to the trial,

the trial court had appointed Central State Hospital to conduct an independent

---

[37] To the extent trial counsel failed to raise and litigate this issue at trial or on

evaluation of Petitioner to assess whether he was legally insane at the time of the act.

(T. 473-518). Gary Carter, M.D., an employee of Central State Hospital, conducted

the evaluation and rendered a report opining that Petitioner did not meet the standard

for insanity. (T. 793-798, 632-662). The State called no expert witnesses on the

topic of Petitioner's mental health, relying instead exclusively on "the court's"

expert, Dr. Carter. The use of this witness violated Petitioner's rights under the

Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

222.) After the jury was impaneled and sworn, the prosecutor made a startling

announcement to the court and asserted a motion "on behalf" of Dr. Carter:

> Your expert, Dr. Carter, got in touch with our office and
> asked us to discuss with you — of course, I can't discuss
> it with you without defense counsel and defendant here
> — he wants to be present when the defense experts are
> heard so that he can assist us in cross-examination, as
> well as to be able to testify more fully himself. . . .  I am
> just relaying his message and making that motion on his
> behalf.

(H. 1/24/01, 2068). The trial court immediately noted the apparent bias inherent in

Dr. Carter's request stating, "Dr. Carter was supposed to make an examination for

the court. I would hope he would make an impartial witness and just report what

he found in his examination." (H. 1/24/01, 2070). The defendant raised the issue

---

appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

of Dr. Carter's obvious bias and moved the court to bar his testimony. (H. 1/24/01, 2071-2073).

223.) The trial court gave the state and the defense an opportunity outside of the presence of the jury to examine Dr. Carter on the issue. Dr. Carter explained that he had been advised by a colleague that his role was that of a "rebuttal witness" to the defense mental health experts. (T. 759). Judge Towson reiterated his previously expressed concern:

> Well, I don't understand that that is your role, Dr. Carter, to rebut anything. Your role is to, you know, testify fairly, impartially in regard to your examination and evaluation because this is about the only time I know of in our jurisprudence where the court actually calls a witness and, you know, you are the court's witness. . . . I want you to testify fairly and impartial, you know, what you found out, and you – you are not to favor either side. Just give the facts and your opinions.

(T. 759-760). Notwithstanding Judge Towson's twice-expressed concerns, Dr. Carter was permitted to testify as to his examination and observations of Petitioner and his opinion that the defendant was sane. (T. 793-798).

224.) In enacting O.C.G.A. § 17-7-130.1, the legislature surely acknowledged the gravity of the insanity defense, the complexity of mental health issues, and the probative value of an expert witness unaffiliated with either side in the litigation. The statutory scheme mandates the involvement of an impartial psychiatrist or a

111

licensed psychologist to examine the defendant and to testify at the trial. By his own words and the corroborating words of the State, Dr. Carter ignored the statutory mandate and was neither independent nor impartial, aligning himself with the State and expressing partiality. "A court-appointed medical expert cannot be classified as an agent of the [S]tate but must be considered as an independent and impartial witness." Tolbert v. State, 397 S.E. 2d 439 (Ga. 1990).

225.) There is additional evidence of Dr. Carter's and Central State Hospital's lack of neutrality. Prior to trial, Dr. Carter met with the district attorney, two assistant district attorneys, and the chief investigator in the case, G.B.I. Agent Alan Watson. (T. 766-767). At this pre-trial meeting, Dr. Carter provided the prosecution team with an audio tape which of an interview he had with Petitioner – an audio tape that the defense had subpoenaed but that was never produced by Dr. Carter or Central State Hospital. When Dr. Carter was questioned as to why the audio tape of his interview was released to the prosecution without subpoena but denied to the defense which had subpoenaed it, he offered a troubling explanation. He perceived that "the G.B.I. was a force that worked with, you know – with the courts – like I do even though they do evaluations that are – that are part of the record, I felt it was a wider duty." (T. 770-71). Profoundly ignorant of his statutory and court-ordered role of an independent and impartial evaluator, Dr. Carter stated that he "felt that

that was the correct thing to do legally."  (T. 768).

226.)  Regardless of whether his actions were intentional, Dr. Carter subverted the truth-seeking process.  He was appointed by the court as an independent, impartial evaluator of Petitioner's health, yet he sought out the prosecution and offered his services in cross-examining the defendant's experts.  He characterized himself as a rebuttal witness.  He sought legal counsel from the State to move the court on his behalf for relief from the rule of sequestration of witnesses.  Dr. Carter simultaneously met with the lead prosecutor, his assistants, and the chief investigating G.B.I. agent to share information, while denying defense counsel to their own client's medical records.  Dr. Carter displayed profound ignorance of his role and the role of the other parties involved in the case when he justified his release of the audio-taped interview with Petitioner to the G.B.I. as release of the evidence to the court.

227.)  Dr. Carter so clearly failed to discharge his obligations of independence, impartiality, thoroughness, and accuracy.  His testimony was given in violation of Petitioner's rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[38]  As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme

Court authority or is based upon an unreasonable determination of the underlying

facts in light of the evidence presented, habeas relief should follow.

### CLAIM TWENTY-SEVEN

**THE TRIAL COURT ERRONEOUSLY DENIED PETITIONER'S BATSON CHALLENGES AND PERMITTED THE STATE TO STRIKE POTENTIAL JURORS BASED ON RACE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

228.)  This Claim is evidenced by the following:

229.)  All other claims and allegations in this Petition are incorporated herein

by specific reference.

230.)  The trial court denied Petitioner his rights to a fair and impartial jury,

due process, equal protection, a fair trial, and a reliable determination of punishment,

pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

States Constitution by denying Petitioner's <u>Batson</u> challenges.  (V. 2032-2045).

231.)  State and federal law prohibit the exercise of a peremptory challenge

against a single African-American juror on the basis of race.  <u>Gamble v. State</u>, 347

S.E.2d 792, 795 (Ga. 1987); <u>Batson v. Kentucky</u>. 476 U.S. 79 (1986).  In <u>Batson</u>, the

United States Supreme Court prohibited racially biased exercise of peremptory

---

[38]     To the extent trial counsel failed to raise and litigate this issue at trial or on

114

challenges in a single case under the protections of the Fourteenth Amendment of the United States Constitution. A defendant is denied both equal protection and due process when a prosecutor impermissibly strikes jurors on the basis of race.

232.) The State violated the constitutional prohibition in <u>Batson</u> by using seven of its ten allotted strikes to disqualify the majority of prospective African-American jurors. During Petitioner's jury selection, there were eleven African-American prospective jurors who were qualified to sit on the jury. (V. 2032-2045). The prosecution used seven out of the ten strikes allotted to the State to strike seven qualified African-American jurors. <u>Id.</u> The prosecutor attempted to provide race-neutral explanations for using seventy percent of his peremptory strikes to exclude most of the possible African-American jurors. <u>Id.</u> However, a careful examination of the record overwhelmingly demonstrates that the prosecutor's highly questionable explanations were merely pretextual. Additionally, the record demonstrates that the factors the prosecutor provided for exercising his peremptory strikes in a discriminatory manner were factors prevalent and pervasive among other prospective jurors that he did not strike nor challenge for cause.

## A. **Prospective Juror Gasque**

233.) The State asserted that one reason it struck Rosa Gasque, an African-

---

appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

American woman, was because "she initially opposed to the death penalty." (V. 2040). Ms. Gasque told the trial court she was "sure there would be some circumstances that I could feel that I would [vote to impose the death penalty]." (V.1537). The State then asserted: "She may hold it against the State because of her brothers' murders in which she didn't think justice was served in the murder cases of two of her brothers." (V. 2040). Ms. Gasque offered to the court the following: "I've had two brothers murdered in my lifetime and they – the person that killed 'em was never punished. And I just have mixed feelings about that." (V. 1537). However, when the State followed up on the effect her brothers' killings would have on her ability to be a juror, the following colloquy occurred:

> BY ASST. D.A. PETER FRED LARSEN:
> > Okay, well let me ask you this. The fact that an injustice may have happened to you and your family, you wouldn't hold that against Mr. Brannan over there, would you?
> BY ROSA GASQUE:
> > No, no, I hope not. No.
> > > \* \* \*
> BY ASST. D.A. PETER FRED LARSEN:
> > And would you hold it against the State, the prosecutors in this case because of the injustice that may have been done to your family in another case?
> BY ROSA GASOIJE:
> > I hope not, no.
> BY ASST. D.A. PETER FRED LARSEN:
> > Do you think you would?
> BY ROSA GASQUE:
> > I'm trying to be as honest as I possibly can.
> BY ASST. D.A. PETER FRED LARSEN:

116

> I understand, I understand.  You are not opposed to the death
> penalty?
> BY ROSA GASQUE:
>     No, no, I'm not.

(V. 1543).  A.D.A. Larsen also claimed the State struck Ms. Gasque for her own

benefit, as she was having financial difficulties, and to get "a juror who is able to

be here and give their attention, not just under force of contempt or punishment of

contempt if they're not here, but to give fill consideration to what's going on."  (V.

2040-41).

## B.    **Prospective Juror Jackson**

234.)  The State told the court it elected to strike Dorothy Jackson, an African-

American woman, because due to her nursing training, she gained "outside

information or outside knowledge on the very crux of their defense."  (V. 2044).

However, during the voir dire, Ms. Jackson gave no indication that she would carry

outside information into the trial that would harm the State, and in fact, voir dire

shows her knowledge and experience with PTSD to be extremely limited.  The

State's entire colloquy with Ms. Jackson into PTSD is as follows:

> Q:    Okay. Do you have any — do you know anybody that's a
>       combat veteran from any war?
> R:    No.  Do you know what post traumatic stress disorder is,
>       PTSD?
> R:    Yeah.
> Q:    Okay, what is that?

117

R:    Well, I did graduate from nursing school, it's been a long time. When you be stressed out, like sort of stressed out over certain things . . . .

Q:    Do you have any friends or relatives or just acquaintances that have ever been diagnosed with PTSD?

R:    No.

(V.615).  Defense attorney's following colloquy with Ms. Jackson further supported that Ms. Jackson's limited knowledge of PTSD would not in any way bias the State:

Q:    And I think Judge Towson just told you very briefly that we'd be setting out and attempting to prove an insanity defense.  You understand that?

R:    Uh-huh.

Q:    Did that bring any thoughts to your mind when you heard that a day or two ago?

R:    No.

Q:    Do you feel like you could receive that evidence from perhaps some regular or lay people or from some experts in the mental health industry?

R:    Explain that again, now.

Q:    Do you think you could listen with an open mind to expert witnesses, some doctors or psychologists about those kind of issues?

R:    Yes.

Q:    Be open to that as a proposition?

R:    Yes.

Q:    All right. In your travels, have you come across any combat veterans who talk about post traumatic stress as an issue, whether they recognize it as legitimate or poo poo it as something that they don't think exists?

R:    No.

Q:    Any thoughts on that at all, for yourself?

R:    Unh-unh.

118

(V. 621-23).  Furthermore, Ms. Jackson expressed a bias against mental illness as a mitigating factor:

> Q:    [D]o you feel like if we got the second stage, if the jury convicted of murder, that you would feel like mental illness or a history of mental illness might play apart in your decision about life or death?
> R:    No.
> Q:    Why do you say that?
> R:    Well, sometimes you know what you're doing. And then sometimes you don't know what you're doing. But you have to, you know, you have to – how do you say, reap what you sow.

(V. 623-24).

235.)  The State also told the court it was "concerned that she might have some bias against the State, because the State has prosecuted her before" for fraud in obtaining public assistance.  (V. 2044).  However, the State did not strike others who had problems with the law, such as alternate juror Adam Johnson, who was charged with aggravated assault.  (V. 2039).  Additionally, Ms. Jackson had law enforcement connections as she worked at the time of voir dire with the Federal Law Enforcement Training Center doing role playing.  (V. 620-21).  Ms. Jackson was more likely to have a bias for law enforcement than against the State.

## C.  __Prospective Juror Johnson__

236.)  The State told the court it stuck Julius Johnson, an African-American man, because he served in Vietnam and "he seemed to us to be a gentleman who had

some pre-conceived ideas in regard to PTSD." (V. 2042). This assertion is

contradicted by the following colloquy between the State and Mr. Johnson:

> Q:  Okay. Do you think PTSD is – well, let me rephrase it.  Do you
>      have an open mind as to PTSD, what it is and what it ain't?
> R:  Well, I would just – all I went by what they said at the time of
>      the people that we were hauling back to bring 'em [during
>      Vietnam].
> Q:  Okay, the fact is you really don't know what [PTSD] is?
> R:  No.
> Q:  You'd be willing to –
> R:  – Yes.
> Q:  – you've got an open mind on what it is and what –
> R:  Yeah, that's what – that's what the corpsman told me and I was
>      a truck driver and hauling 'em, hauling people [during
>      Vietnam], yeah. I was a bus driver.

(V. 1601-02). The State's assertion to the court was pretext for race, because Mr.

Johnson's experience with PTSD was non-existent; he had no idea what it was.

The State elected to strike Mr. Johnson, along with the majority of African-

American potential jurors, due to his race was a direct violation of Batson.

### D.     **Prospective Juror Lampkin**

237.)  The State asserted that it chose to strike Darrell Lampkin, an African-

American man, due to his general demeanor:  "Mr. Lampkin told us further, and I'm

not trying to insult the Court – Mr. Lampkin at one time said words to the effect, I

don't want to be involved – what, I don't want to be involved in this shit. Now that

demonstrates his attitude about the thing.  Don't want to be involved in this shit."

120

(V. 2034). Mr. Lampkin <u>never</u> used those words. He simply stated, "I was hoping that you wouldn't select me, to be honest with you." (V. 160). Mr. Lampkin expressed a common sentiment of not wanting to be involved with the trial. The State did not elect to strike others simply for not wanting to be there. It is not unreasonable to question whether racial bias also played into the State's misstatement of what Mr. Lampkin said. Adding to his sentiments the phrase, "I don't want to be a part of this shit," was not only incorrect, it was an inexcusable exaggeration. (V. 132-173).

238.) The State's proffered reason for striking Mr. Lampkin was pretexual. The State elected to strike Mr. Lampkin and mischaracterize his sentiments due to his race in direct violation of <u>Batson</u>.

### E. **Prospective Juror Moore**

239.) The State's proffered reasons for striking Erika Moore, an African-American woman, were that she was hesitant in supporting the death penalty and that she had been charged with two crimes: aggravated assault in 1989 and a forgery charge that had been dropped. (V. 2037-2038). As Ms. Moore repeatedly indicated her ability to vote for the death penalty, and, as the State did not choose to strike other potential jurors, such as alternate juror Adam Johnson, for charged crimes, the State's reasons for striking Ms. Moore were pretext for striking her due to her race.

121

(V. 2039). The State incorrectly recounted Ms. Moore's statements and responses, telling the court, "Initially, she did not approve of capital punishment, she was very hesitant in doing so. She said she believed in: do unto others as you would have them do unto you. At one time she stated she would always go for life without parole." This is simply not true.

240.) Ms. Moore's own statements show that she did not disapprove of capital punishment.

> Q:   Ms. Moore, are you conscientiously opposed to capital punishment? Do you understand what capital punishment is?
> R:   Yes sir.
> Q:   The death penalty.
> R:   No, I'm not opposed.

(V. 1481). Ms. Moore clearly and unequivocally stated at the beginning of her voir dire that, yes, she understands what capital punishment is, and no, she is not opposed. The second incorrect assertion by the State was that she was very hesitant to approve of capital punishment citing her religious views. The following colloquy between Ms. Moore and the State exhibits the false nature of this assertion:

> Q:   Now, let me ask you a couple of questions. Some people have religious, personal or moral reasons. They don't like to be on the jury because you know, the Bible says judge not, lest ye be judged . . ..
> R:   Right.
> Q:   Now, does that cause you problems?

> R:  Not I – because of my religion and because of the Bible what it
>     states about the judge not and thou shalt not kill.
> Q:  Yes ma'am.
> R:  I still don't find a problem for the death penalty because of the
>     fact that it's a murder case.
> Q:  Okay.
> R:  And that that life that he took was an innocent life.
> Q:  Okay. . .
> R:  I mean you don't do unto others as they would do unto you, but
>     I still feel like, you know, because if you let him off, there's no
>     telling he might do it again.
> Q:  So in your opinion would be that if a person murders, then they
>     should get the death penalty if they kill somebody?
> R:  Not necessarily, it all depends.

(V.1484).  Ms. Moore showed her openness to the death penalty, possibly even

her leanings toward it.

241.)  The State's interpretation of Ms. Moore's views toward the death

penalty was bizarre, as she indicated initially and throughout that she was open and

willing to impose the death penalty.  The State's proffered reason for striking Ms.

Moore was not supported by the record and was pretexual.  Striking Ms. Moore was

in direct violation of <u>Batson</u>.  The trial court erred in denying Petitioner's <u>Batson</u>

challenge regarding Ms. Moore.


### F.  <u>Prospective Juror Murray</u>

242.)  The State told the court it chose to strike Willie Murray, an African-

American male, because he was inclined against the death penalty, and because his

123

grandson was arrested and awaiting trial for aggravated assault. However, Mr. Murray gave absolutely no indication he was inclined against the death penalty, consistently responding that he had no problems with it and he could sentence someone to it if the evidence warranted it. (V. 449-63). Additionally, Mr. Murray's step-son was arrested and awaiting trial for an aggravated assault charge. (V. 460). His step-son did not live with Mr. Murray before the arrest, and Mr. Murray assured the court that he was not biased against the State and that he had no opinion as to who should prevail in Petitioner's case. (V. 461,450). Moreover, Adam Johnson was charged with assault on a police officer yet was not struck by the State and served as an alternate juror. (V. 2039).

243.) The State proffered no sufficient reason to strike Mr. Murray. Mr. Murray is a forceful example of the State's <u>Batson</u> violation. The trial court erred in denying Petitioner's <u>Batson</u> challenge regarding Ms. Moore.

### G.     <u>Prospective Juror Williams</u>

244.) The State told the trial court that it chose to strike Douglas Williams, an African-American male because of his initial statement against the death penalty. (V. 2042). Again, this assertion is not supported by the record. Throughout the State's questioning of Mr. Williams, Mr. Williams responded consistently that he could consider voting for the death penalty, specifically in a case with the aggravating

124

circumstances such as Petitioner's. (V. 563-64, 567, 569-72). Not once did he state

hesitation to impose the death penalty if the evidence warranted it. Furthermore, his

following expression of "mixed feelings" demonstrated his ability to take his role as

sentencer seriously:

> BY DOUGLAS L. WILLIAMS:
>> If it's like the Judge said, if it's clear that this has happened, I
>> could do that. Whether, if I could, I'd like to explain some of
>> the problems I have with it.
> BY D.A. RALPH WALKE:
>> Okay . . .
> BY DOUGLAS L. WILLIAMS:
>> If so many people saw a person kill someone and these people
>> are, you know, they are good people that see, looked at this.
>> And say it was so many children or something that he had – I
>> have no problem with it. But if there's some doubt there, and
>> we don't really know, that's more or less what I'm saying, I
>> have a problem with.

(V. 567). Mr. Williams was willing to impose the death penalty when

circumstances warranted it. Contrary to the State's assertion, he made no

statements against the death penalty, simply against imposing it when the evidence

was insufficient to prove guilt.

245.) The State proffered no sufficient reason to strike Mr. Williams. The

State's decision to strike Mr. Williams as an African-American violated Batson.

246.) The trial court committed reversible error in denying Petitioner's

individual Batson challenges of the State's election to strike prospective jurors

125

Gasque, Jackson, Johnson, Lampkin, Moore, Murray, and Williams and in denying Petitioner's general <u>Batson</u> challenge of using the majority of strikes to keep the majority of African Americans off the jury.

247.)  The trial court committed reversible error by allowing the State to use seven of ten peremptory strikes against prospective jurors on the basis of race, violating Petitioner's rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[39]  As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[39]  To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM TWENTY-EIGHT

**THE TRIAL COURT'S REHABILITATION OF PROSPECTIVE JURORS AND ITS FAILURE TO EXCLUDE CERTAIN PROSPECTIVE JURORS FOR CAUSE VIOLATED PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

248.) This Claim is evidenced by the following:

249.) All other claims and allegations in this Petition are incorporated herein by specific reference.

250.) The trial court erroneously failed to excuse for cause a number of prospective jurors whose voir dire responses demonstrated that they could not be fair and impartial in this case. These jurors could not enter the trial with the mental attitude of necessary and critical objectivity which jurors must have to fulfill their duties. Cannon v. State, 552 S.E. 2d 922, 924 (Ga. App. 2001) (overruled on other grounds by Jackson v. State, 562 S.E. 2d 847 (Ga. App. 2002)).

251.) An appellate court "will reverse a trial court's decision whether to discharge a prospective juror on grounds of favor only when the record as a whole shows an abuse of discretion." Cannon, 552 S.E.2d at 924 (Ga. App. 2001).

252.) The trial court erred specifically and abused its discretion in attempting to rehabilitate and not removing certain venire persons upon challenge for cause by

Petitioner. If the trial court denies a defense challenge for cause and the defendant uses a peremptory strike to remove the juror, the error is harmful, even if the defendant does not use all of his peremptory challenges. Harris v. State, 339 S.E.2d 712 (1986). The court abused its discretion by relying "solely on a prospective juror's assurances of his impartiality where the record shows on its face that the juror has a compelling bias or interest in the outcome of the case. . . ." McClain v. State, 477 S.E. 2d 814 (Ga. 1996).

253.) The purpose of voir dire is to assure that jurors are impartial. When there is a question as to whether to dismiss,

> a trial judge should err on the side of caution by
> dismissing, rather than trying to rehabilitate, biased jurors
> because, in reality, the judge is the only person in a
> courtroom whose primary concern, indeed primary duty,
> is to ensure the selection of a fair and impartial jury. . . .
> The trial judge, in seeking to balance the parties'
> competing interests, must be guided not only by the need
> for an impartial jury, but also by the principle that no
> party to any case has a right to have any particular person
> on their jury.

Walls v. Kim, 549 S.E.2d 797, 799 (Ga. App. 2001). The trial court abused its discretion by asking rehabilitation questions that were "more instruction[s] on the desired answer than a neutral attempt to determine the juror's impartiality." Walker v. State, 424 S.E.2d 782 (1993).

254.) These errors occurred in regards to, among others, prospective jurors

128

Holcomb, Worst, and Elbaum. (V. 291-304, 360-67, 718-20). A criminal defendant is entitled to an impartial jury by the Sixth Amendment to the United States Constitution. A potential juror should be excused for cause when her views on the death penalty would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath. Wainwright, 469 U.S. at 424-25. If, after sufficient voir dire, the prospective juror's answers indicate that her "views on capital punishment are such as to make [her] unable to follow the law or obey [her] oath," Adams v. Texas, 448 U.S. 38 (1980), the court must excuse the juror for cause. A juror who believes that the death penalty is the only appropriate sentence for a murder conviction is not likely to weigh aggravating and mitigating circumstances fairly and is not capable of being impartial. Morgan v. Illinois, 504 U.S. 719 (1992); Skipper v. State, 364 S.E. 2d 835 (Ga. 1988); Pope v. State, 345 S.E. 2d 831(Ga. 1986). In our system of justice, "the measure of a jury is taken by reference to the impartiality of each individual juror . . . each of these jurors must stand equally impartial in his or her ability to follow the law." Morgan, 504 U.S. at 724, n.8.

255.) The trial court abused its discretions in not excusing prospective jurors Holcomb, Worst, and Elbaum for cause and in denying Petitioner's rights under the

Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[40]

As the failure of the state court to grant relief on this claim is contrary to or an

unreasonable application of Supreme Court authority or is based upon an

unreasonable determination of the underlying facts in light of the evidence

presented, habeas relief should follow.

### CLAIM TWENTY-NINE

**PETITIONER'S TRIAL WAS FRAUGHT WITH PROCEDURAL AND SUBSTANTIVE ERRORS, WHICH CANNOT BE HARMLESS WHEN VIEWED AS A WHOLE, AS THEY DEPRIVED HIM OF THE FUNDAMENTALLY FAIR TRIAL TO WHICH HE IS CONSTITUTIONALLY GUARANTEED UNDER THE DUE PROCESS CLAUSE AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

256.) This Claim is evidenced by the following:

257.) All other claims and allegations in this Petition are incorporated herein

by specific reference.

258.) In <u>Matthews v. Eldridge</u>, 425 U.S. 319, 334-35 (1976), the United

States Supreme Court stated:

> [Our] decisions underscore the truism that [d]ue process,
> unlike some legal rules, is not a technical conception
> with a fixed content unrelated to time, place and

---

[40]      To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

circumstances. [D]ue process is flexible and calls for such procedural protections as the particular situation demands. Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. (citations, internal quotations omitted).

259.) Matthews, of course, dealt with the fundamental question of the necessity of requiring formal hearings on disputed issues. The Supreme Court's analysis of the considerations regarding the necessity of procedural safeguards is highly enlightening and instructive. Matthews teaches that it is simply not enough for the Government to provide "a process" to dispose of disputed matters. Rather, the process must be fair to all parties and must be flexible enough to accommodate the particular litigation involved. A capital defendant has a "constitutional right to a fair trial regardless" of the offense. Heath v. Jones, 941 F.2d 1126, 1131 (11th Cir. 1991).

260.) Petitioner contends that he did not receive the fundamentally fair trial to which he was constitutionally entitled. It is Petitioner's contention that the process itself has failed him; it failed him at his pretrial proceedings, the guilt/innocence phase of his trial, the sentencing phase of his trial, and his direct appeal. It has failed, because the sheer number and types of errors involved in his proceedings – when considered as a whole – virtually dictated the sentence that he would receive.

261.) The flaws in the system which sentenced Petitioner to death are many. They have been pointed out throughout Petitioner's motion for new trial, on direct appeal, throughout his state habeas proceedings, and herein and, while there are means for addressing each individual error, the fact is that addressing these errors on an individual basis will not afford adequate safeguards against an improper conviction and improperly imposed death sentence – safeguards which are required by the Constitution.

262.) The United States Supreme Court has consistently emphasized the uniqueness of death as a criminal punishment. Death is "an unusually severe punishment, unusual in its pain, in its finality, and in its enormity." Furman, 408 U.S. at 287 (Brennan, J., concurring). It differs from lesser sentences "not in degree but in kind. It is unique in its total irrevocability." Id. at 306 (Stewart, J., concurring). The severity of the sentence "mandates careful scrutiny in the review

132

of any colorable claim of error." <u>Zant v. Stephens</u>, 462 U.S. 862, 885 (1983).  Thus,

greater caution and safeguards must be utilized to ensure the constitutional validity

of each death sentence.

> Death is a different kind of punishment from any other
> which may be imposed in this country . . ..  [I]t is
> different in both its severity and its finality. . . .  [T]he
> action of the sovereign in taking the life of one of its
> citizens also differs dramatically from any other
> legitimate state action.  It is of vital importance to the
> defendant and to the community that any decision to
> impose the death sentence be, and appear to be, based on
> reason rather than caprice or emotion.

<u>Gardner v. Florida</u>, 430 U.S. 349, 357 (1977) (citations omitted); <u>Woodson v.</u>

<u>North Carolina</u>, 428 U.S. 280 (1976); <u>Beck v. Alabama</u>, 447 U.S. 625, 638 (1980).

263.)  Petitioner contends that numerous and varied violations occurred at his

trial – the pretrial proceedings, the guilt phase, the penalty phase, and the direct

appeal.  However, the claims which arise as a result of Petitioner's trial should not

only be considered separately.  Rather, it is his contention that, for the same reasons

each claim of error in a capital case must be carefully scrutinized, the claims should

also be considered in the aggregate for when the separate infractions are viewed in

their totality it is clear that Petitioner did not receive the fundamentally fair trials to

which he was constitutionally entitled.  The numerous constitutional claims in this

Petition show that these trials were fundamentally flawed.

264.) A series of errors may accumulate a very real, prejudicial effect. The burden remains on the State to prove that the individual errors did not affect the verdict, and more importantly, that the cumulative impact of these errors did not affect the verdict. In Petitioner's case, relief is proper.

265.) The failure of trial counsel to prepare for and present an adequate case of Petitioner's mental illness, the failure to adequately investigate and present a case for mitigation, the errors on the part of the court at both phases of the trial, as well as the State misconduct throughout the proceedings in this case, virtually dictated what the verdict and sentence would be in this case.[41] As a result, Petitioner was not afforded the fundamentally fair trial to which he was entitled under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[41] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM THIRTY

**AS PETITIONER HAS LONGSTANDING, SEVERE MENTAL ILLNESS, HIS EXECUTION WILL VIOLATE THE PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT IN THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

266.) This Claim is evidenced by the following:

267.) All other claims and allegations in this Petition are incorporated herein by specific reference.

268.) The United States Supreme Court has identified two groups of people who, under the protection of the Eighth Amendment, are categorically ineligible for the death penalty: offenders who are mentally retarded and offenders who were juveniles at the time of their offense. Atkins v. Virginia, 536 U.S. 304 (2002); Roper v. Simmons, 543 U.S. 551 (2004).

269.) It is now time for courts to recognize that, in addition to protecting juveniles and the mentally retarded, the Eighth Amendment protects from execution individuals who suffered from severe mental illness at the time of their capital offense. Petitioner is such an individual. Because of his longstanding, severe mental illness, which was present at the time of the offense, his death sentence is unconstitutional under the United States Constitution.

270.) The Eighth Amendment to the United States Constitution bars the

135

execution of persons with severe mental illness. "The provisions of the Constitution are not time-worn adages or hollow shibboleths;" rather, "[t]hey are vital, living principles." Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion). As to the Eighth Amendment, the core, underlying concept "is nothing less than the dignity of man." Id. at 100. The amendment upholds the "broad and idealistic concepts of dignity, civilized standards, humanity, and decency" by which a society measures itself. Estelle v. Gamble, 429 U.S. 97, 102 (1976).

271.) Under the Eighth Amendment, death is an excessive penalty for a crime when it is contrary to "contemporary values" – that is, "the 'evolving standards of decency' that mark the progress of a maturing society." Penry v. Lynaugh, 492 U.S. 302, 330-31 (1989) (quoting Trop, 356 U.S. at 101).

272.) The Supreme Court has set forth a three-prong analysis to assess whether a sentence violates the Eighth Amendment: "First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective?" Gregg v. Georgia, 428 U.S. 153, 173 (1976). Petitioner will address each of these questions in turn to demonstrate that to execute him and other severely mentally ill offenders will violate the Eighth Amendment.

### A. Evolving standards of decency prohibit the execution of individuals with severe mental illness, such as Petitioner.

273.) This country's standards of decency evolve over time, and there is no set time frame within which they must evolve for a group of people to invoke the protections of the Eighth Amendment. In order to evaluate the evolution of standards of decency that inform the Eighth Amendment, the Court must look to a variety of sources. Atkins, 536 U.S. at 311-12. Initially, it must look to objective factors that reflect the evolving standards of a maturing society, including public opinion, contemporary human knowledge, jury verdicts, and legislation. Weems v. United States, 217 U.S. 349, 378 (1910); Robinson v. California, 370 U.S. 660, 666 (1962); McGautha v. California, 402 U.S. 183, 199 (1971); Simmons, 543 U.S. at 562-64.

274.) Such objective sources can assist the Court and inform it, but "in the end" the Court must exercise its "own judgment . . . on the question of the acceptability of the death penalty under the Eighth Amendment." Atkins, 536 U.S. at 311-12. "If the judicial conclusion that a punishment is 'cruel and unusual' depended upon virtually unanimous condemnation of the penalty at issue, then, 'like no other constitutional provision, [the Clause's] only function would be to legitimize advances already the conventional wisdom.'" Furman v. Georgia, 408 U.S. 238, 268 (1972) (citations omitted).

275.)  In the case of individuals who were mentally ill at the time of the offense, there is extensive objective evidence demonstrating that the standards of decency have evolved to prohibit their execution, including the actions of state legislatures, the professional opinions of medical and legal organizations, the position of the general public, and relevant international law.  The majority of state legislatures in this country have enacted laws designed to accommodate mentally ill offenders, while many professional mental health and legal associations in the U.S. oppose the execution of severely mentally ill offenders. [42]  The American public has also recognized the lessened culpability of a person with severe mental illness.[43] Furthermore, international law forbids the execution of the severely mentally ill.[44]

---

[42]     See American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001).

[43]     According to a Gallup Poll taken in 2002, which was apparently the last poll taken on this issue, 75 percent of those surveyed opposed executing the mentally ill, while only 19 percent supported it. The poll surveyed 1,012 Americans across the country May 6-9 of 2002.  See http://www.pollingreport.com/crime.htm (last visited May 7, 2009).

[44]     The Human Rights Commission of the United Nations has interpreted the International Covenant on Civil and Political Rights to forbid the execution of persons with severe mental illness.  See Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Crim. L.F. 95, 100-01

138

**B.** **As a severely mentally ill person, Petitioner's death sentence is grossly disproportionate to his personal culpability.**

276.) Determination of the proportionality of a capital sentence cannot be based solely upon the magnitude of harm resulting from the offense. "[F]or purposes of imposing the death penalty. . . punishment must be tailored to [a defendant's] personal responsibility and moral guilt." Enmund v. Florida, 458 U.S. 782 , 801 (1982).  The personal responsibility of mentally ill and juvenile offenders is inherently decreased because of the traits that separate them from average, adult offenders.

277.)  In Simmons, the Supreme Court listed numerous factors that categorically distinguish juveniles offenders from offenders who were adults at the time of the offense:

- an underdeveloped sense of responsibility,
- a lack of maturity,
- increased recklessness,
- increased vulnerability to outside pressures and negative influences,
- less control of their environment,
- transitory, less fixed personality traits, and
- difficulty defining their identities.

---

(1993). See also International Covenant on Civil and Political Rights, Dec. 19, 1966, Art. 6, 999 U.N.T.S. 171, 174.

<u>Simmons</u>, 543 U.S. at 569-70 (quotations, citations omitted). The combination of these qualities often results in "impetuous and ill-considered" decisions and "immature and irresponsible actions." <u>Simmons</u>, 543 U.S. at 569-70. These factors apply evenly to offenders who were mentally ill at the time of the offense, and their offenses often show the impulsiveness, recklessness, and vulnerability that stems from severe mental illness.

278.) The Supreme Court in <u>Atkins</u> also recognized traits typical of mental retardation, which render a mentally retarded offender inherently less culpable:

- diminished capacity to understand and process information,
- difficulties communicating,
- decreased ability to learn from mistakes and experiences,
- problems with logical reasoning,
- diminished capacity to control impulses, and
- difficulties understand the reactions of others.

<u>Atkins</u>, 536 U.S. at 318. Again, these traits apply equally to the class of offenders who were severely mentally ill at the time of the offense.

279.) Certainly if crimes committed by persons suffering from mental retardation and by juveniles deserve less punishment due to those groups' lesser capacity to control their own conduct, severely mentally ill offenders are also deserving of less than the most severe punishment. "[A] seriously mentally ill person is not among those most deserving to be put to death." <u>Corcoran v. Indiana</u>,

140

774 N.E.2d 495, 503 (Ind. 2002) (Rucker, J. dissenting)).

### C.    Petitioner's death sentence lacks penological justification.

280.) The Supreme Court has held that the death penalty is excessive when "it 'makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering.'" Penry, 492 U.S. at 335 (quoting Coker, at 592). The Court has identified "'two principal social purposes'" served by capital punishment: "'retribution and deterrence of capital crimes.'" Penry, 492 U.S. at 335-336, (quoting Gregg, at 183).

281.) Unless the death penalty "measurably contributes" to either the goal of deterrence or the goal of retribution, it is "nothing more than the purposeless and needless infliction of pain and suffering," and thus an unconstitutional punishment. Enmund v. Florida, 458 U.S. 782, 798 (1982). Capital punishment inflicted on individuals who were mentally ill at the time of the offense serves only to impose needless pain and suffering. It fails to serve a penal purpose more effectively than a less severe penalty, and it makes no measurable contribution to acceptable goals of punishment, such as both retribution and deterrence.

282.) There is no question that Petitioner is severely mentally ill; the court-appointed expert from trial, the defense-retained expert, and the many mental health

professionals who evaluated Petitioner through the Veteran's Administration have found that he has a long history of mental illness. Psychiatric testing and evaluation show that Petitioner's history of depression and mood disorder predated his wartime service, while his Post-Traumatic Stress Disorder dates from his time in the Vietnam War. (EH. T. at 2:243). Petitioner's history of depression dates back to childhood, and his mood swings are well documented. (EH. T. at 2:259). Petitioner's Bipolar Disorder and PTSD existed at the time of the offense, and as a result he qualified for a verdict of guilty but mentally ill under Georgia law. (PX. 74 at 21:5641; EH. T. at 2:296, 316). The court-appointed psychiatrist found that, at the offense, Petitioner suffered from severe mental illness such that it "significantly impair[ed his] judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." (PX. 77 at 21:5673); O.C.G.A. § 17-7-131(a)(2). This is evidenced by Petitioner's inability to readjust to life upon being honorably discharged from the Army, his inability to establish interpersonal relationships, and his problems maintaining employment. (PX. 9 at 5:909). In August of 1984, Petitioner's younger brother committed suicide, almost nine years after his older brother died in a military plane crash. (PX. 45 at 16:4173). These two events exacerbated Petitioner's PTSD and mood disorder. (PX. 9 at 5:951). Petitioner was hospitalized for his mental illness in the summer of 1989 and was deemed 100

142

percent disabled by the federal government due to his severe mental illness. (PX. 9 at 5:924, 927).

283.) Under the Eighth Amendment to the United States Constitution, this Court must find that executing men and women who were severely mentally ill at the time of their offenses is unconstitutional. "As a society, we have always treated those with mental illness differently than those without. In the interest of human dignity, we must continue to do so." Ohio v. Scott, 748 N.E. 2d 11 (Ohio 2001) (J., Pfeifer, dissenting). This Court must conclude that death sentences of Petitioner and other severely mentally ill offenders are cruel and unusual.[45]

284.) As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[45]    To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## CLAIM THIRTY-ONE

**THE EXECUTION OF PETITIONER BY LETHAL INJECTION AS CARRIED OUT BY THE STATE OF GEORGIA AND THE GEORGIA DEPARTMENT OF CORRECTIONS WOULD CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT AND A MISCARRIAGE OF JUSTICE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

285.)  This Claim is evidenced by the following:

286.)  All other claims and allegations in this Petition are incorporated herein by specific reference.

287.)  The State of Georgia intends to execute Petitioner by poisoning him with a lethal combination of three chemical substances: sodium thiopental or sodium pentothal (an ultrashort-acting barbiturate); pancuronium bromide or Pavulon (a curare-derived agent, which paralyzes all skeletal or voluntary muscles but which has no effect whatsoever on awareness, cognition or sensation); and potassium chloride (an extraordinarily painful chemical, which activates the nerve fibers lining the inmate's veins and which can interfere with the rhythmic contractions of the heart and cause cardiac arrest).

288.)  This particular combination of chemicals will cause Petitioner to consciously suffer an excruciatingly painful and protracted death.  Sodium thiopental, or sodium pentothal, is a short-acting barbiturate, which is ordinarily

used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on his own power if any complications arise in inserting a breathing tube pre-surgery. Because of its brief duration, sodium thiopental may not provide a sedative effect throughout the entire execution process.

289.)  Due to the chemical combination used in the Georgia execution process, there is also a probability that the sedative effect of the sodium thiopental is neutralized by the second chemical, pancuronium bromide.  The second chemical involved in the lethal injection process, pancuronium bromide, or Pavulon, is a derivative of curare that acts as a neuromuscular blocking agent.  While Pavulon paralyzes skeletal muscles, including the diaphragm, it has no effect on consciousness or the perception of pain or suffering.  To the extent that the first chemical, sodium thiopental, is neutralized by the second, Pavulon, the paralytic chemical (Pavulon) will serve only to mask the excruciating pain of Petitioner.

290.)  The risk of inflicting severe and unnecessary pain and suffering upon Petitioner in the lethal injection process is particularly grave in Georgia, because the procedures and protocols designed by the Georgia Department of Corrections do not include safeguards regarding the manner in which the execution is to be carried out, do not establish the minimum qualifications and expertise required of the personnel

145

performing the critical tasks in the lethal injection procedure, and do not establish appropriate criteria and standards that these personnel must rely upon in exercising their discretion during the lethal injection procedures.

291.)  To subject a human being to such torture violates the "evolving standards of decency which mark the progress of a maturing society."  <u>Trop v. Dulles</u>, 356 U.S. 86, 101 (1958).[46]  To execute Petitioner by lethal injection, under the current policies and practices of the State of Georgia, would be cruel and unusual in violation of Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution.  As the failure of the state court to grant relief on this claim is contrary to or an unreasonable application of Supreme Court authority or is based upon an unreasonable determination of the underlying facts in light of the evidence presented, habeas relief should follow.

---

[46]     To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully prays that this Court:

1.    Review the claims alleged in this Petition on the merits;

2.    Issue a Writ of Habeas Corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint, and/or be relieved of his unconstitutional sentence of death;

3.    Permit Petitioner, who is indigent, to proceed *in forma pauperis*;

4.    Grant Petitioner, who is indigent, sufficient funds to secure the expert and investigative assistance necessary to prove the facts as alleged in this Petition;

5.    Grant Petitioner the authority to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts alleged in this Petition;

6.    Allow discovery, pursuant to Rule 6, Rules Governing § 2254 Cases in the United States District Court;

7.    Conduct a hearing at which proof may be offered concerning the allegations of this Petition;

8.    Allow Petitioner to amend his petition after the assistance of experts and discovery, and in the event of any other changes in the law or facts relevant to his case;

9.    Allow Petitioner to brief the precedential and statutory law relevant to his case in light of the record and the allegations raised by this Petition;

10.    Allow Petitioner to respond to any procedural or affirmative defenses, and to any other arguments that the Respondent might raise in this action; and

11.     Petitioner a period of sixty (60) days, which  period shall commence
        after the completion of any hearing this  Court shall determine to
        conduct, in which to brief the issues of  law raised by this petition;

12.     Grant such other relief as may be appropriate.


Respectfully submitted this the 15th day of May, 2009.



Respectfully submitted,

**s/Brian Kammer**
Brian Kammer (Ga. 406322)
Georgia Resource Center
303 Elizabeth Street NE
Atlanta, GA 30307
404-222-9202
Email: georgiaresource@mindspring.com

Lane Dennard (Ga. 217750)
851 Walker Circle
Madison, GA 30650
706-342-7104
Email: ldennard@bellsouth.net

COUNSEL FOR PETITIONER

148

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| ANDREW H. BRANNAN | ) | |
| Petitioner, | ) | |
| | ) | Civil Case No. _____ |
| v. | ) | |
| | ) | **CAPITAL CASE** |
| HILTON HALL, Warden, | ) | |
| Georgia Diagnostic & | ) | |
| Classification Prison, | ) | |
| Respondent. | ) | |

## NOTICE OF ELECTRONIC FILING AND CERTIFICATE OF SERVICE

This is to certify that on May 15, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/EMF system which will send notification of such filing to the following: Beth Burton (bburton@law.ga.gov). I also certify that I have served the foregoing document and this notice of electronic filing on Respondent this day by electronic mail to:

Beth Burton, Esq.
Senior Assistant Attorney General
bburton@law.ga.gov

**s/Brian Kammer**
Brian Kammer (Ga. 406322)
Georgia Resource Center
303 Elizabeth Street, NE
Atlanta, GA 30307
404-222-9202
Email: georgiaresource@mindspring.com